## Pool, Administratrix, *v.* The C., B. & Q. R. Co.

*(Circuit Court, D. Iowa.* May 11, 1881.)

1. **Juror—Misconduct—Prejudice.**

   Where the natural tendency of what a juror does or says or willingly listens to from others is to bias his mind, or where his misconduct evinces a prejudgment of the case, or ill-will, or passion against the losing party, the inference of prejudice in the true sense inevitably follows, because the verdict cannot be said to be the result of a fair trial.

2. **Same—Same—Same.**

   Under such circumstances the mere facts that the successful party was not in fault, and that the verdict was approved by the court, does not relieve the case from the inference of prejudice.

3. **Same—Same—Same.**

   Where a juror talks outside the jury room about a case pending and undecided before him, he gives the clearest evidence that he is not an impartial and unbiased juror.

4. **Same—Same—Same.**

   The statement of a juror that what he has thus said or heard has not affected or influenced his judgment, is not, under such circumstances, entitled to any weight.

5. **New Trial—Misconduct of Jurors—Prejudice.**

   Part of the jurors engaged in the trial of a cause passed several consecutive evenings at cards in the room of one of the defendant's counsel, at the hotel where some, but not all, of said jurors were stopping. It appeared that the counsel did not know that these jurors were of the party when he consented that his room should be thus occupied, and that when he discovered that fact he studiously kept aloof from the room every evening until after the card party had dispersed. It further appeared that while the case was yet before the jury and undecided, one of the jurors had talked freely and fully with a third party about the case, and had in such conversation expressed himself to the prejudice of the plaintiff and the plaintiff's counsel. It also appeared that after the jury had retired for consultation that this same juror moved that one of their party act as foreman, and that then, upon motion, said juror was appointed secretary. *Held,* in view of these circumstances, that the verdict should be set aside and a new trial granted.—[Ed

Motion for a New Trial.

*Hagerman, McCrary & Hagerman,* for plaintiff.

*H. H. Trimble* and *J. W. Blythe,* for defendant.

Love, D. J. This case was tried by jury at the last January term, in Keokuk. The jury gave a verdict for the defendant.

The plaintiff now moves for a new trial. The plaintiff is the widow and administratrix of Erastus P. Pool, deceased, who lost his life in consequence of personal injuries received in attempting to make a coupling while in defendant's service. The action is to recover damages resulting from the injuries thus received. The plaintiff's counsel have, in support of the motion, insisted on many grounds of law and fact which I deem it needless to consider. I shall confine what I have to say to the alleged misconduct of the jury. In this matter some very material facts relied upon for the motion have been disproved. Others have been so far explained by counter affidavits as to relieve the case of the bad aspect in which it might otherwise appear to the court. I shall pass all doubtful or disproved facts without notice, confining my attention exclusively to such as have been clearly proved.

It undeniably appears that a number of the jurors, during the progress of the trial, passed several consecutive evenings at cards in the room of one of the defendant's counsel, at the hotel where some, but not all, of said jurors were stopping. This was a great and reprehensible impropriety, and if it did not clearly appear that the jurors mentioned occupied the room in question without any invitation or inducement from the defendant's counsel, I would not hesitate to set aside the verdict on that ground alone. But it does appear affirmatively, by the affidavits which have been filed, that the jurors occupied Judge Trimble's room under peculiar circumstances, which relieve both Judge Trimble and Mr. Blythe, his associate counsel, from any just censure or responsibility. It is due alike to the counsel concerned and to the court that the circumstances referred to should be stated and placed upon record.

It appears that Judge Trimble and Mr. Blythe occupied separate rooms upon the same floor of the hotel. These gentlemen were closely occupied at Mr. Blythe's room till late in the evening of each day during the trial, examining witnesses, and otherwise preparing their defence. Judge Trimble's room was virtually unoccupied by him till a late hour of the night, and not, it appears, till the card party had dispersed.

The fact that the jurors in question occupied Judge Trimble's room at all is satisfactorily explained.

It appears to have been arranged that some jurors in attendance upon the court should while away their evenings at cards in the rooms of Colonel Milo Smith, who was a juror of the regular panel, but not in the Pool case. It so happened that Mrs. Smith, after some days, reached the city, and it therefore became necessary to abandon the arrangement for meeting at Colonel Smith's rooms.

Thereupon John R. Wallace, who was not a juror in the case then on trial, seeing that Judge Trimble's room was unoccupied, asked him if he had any objection to their card party meeting at his room. He did not state to Judge Trimble who the persons engaged in the card playing were; and the latter, when he gave consent to their using his room, was not aware that any juror in the Pool case was of the party. It clearly and indubitably appears that when Judge Trimble and Mr. Blythe afterwards came to know that some members of the jury in the case then on trial were of the card party, they kept studiously aloof from Judge Trimble's room. It is proved clearly that Mr. Blythe was never in the room at all when the jurors were there, and Judge Trimble was in the room only once during the several nights in question, and then only for a single moment to obtain some needed papers. It appears that neither Judge Trimble nor Mr. Blythe ever, on any occasion during the trial, spoke to any jurors concerning the case, or alluded to the same in their presence except in open court. When Judge Trimble found that some members of the jury in the case were occupying his room, as stated, he was placed in a somewhat embarrassing situation. He had given consent to their occupancy of his room, which was practically vacant. He could not well rescind his assent and order them to vacate the room without danger of giving offence and perhaps prejudicing his client's cause. Both he and Mr. Blythe seem to have done all that could reasonably be expected of them under the circumstances; they kept aloof from the room during its occupancy by the jurors, and abstained scrupulously from making any allusion to the case on

trial to any member of the jury. But the conduct of the jurors themselves was plainly inexcusable. Though it may have been the result of mere thoughtlessness, it was manifestly calculated to bring grave suspicion upon them and upon any verdict they might render. All that the public and the living suitor could know was that several of them who were actually trying the cause were spending night after night in the rooms of the defendant's counsel. How and by what means and under what circumstances they got there; whether with or without invitation; whether with or without purpose respecting the trial; whether to receive or not to receive hospitality,—could not be known or explained to the world without. All this would be matter of mere conjecture, and what conjectures were likely to be made it is needless to say. Even those at the hotel who were informed that these jurors were engaged in an innocent game of cards for amusement might very naturally ask why they did not occupy the room of some one of their own number who was stopping at the house.

The circumstances which have been satisfactorily explained to the court were necessarily unknown to the public; and, although public opinion ought by no means to influence or control the verdict of juries, yet a decent regard to the opinion of mankind is a duty not at all incompatible with the higher and paramount obligation to do exact justice between man and man.

Such conduct as I have referred to on the part of jurors, while trying a cause, merits the most decided reprobation. It tends directly to bring suspicion and discredit upon jury trials, and upon the administration of justice itself. No suitor could feel otherwise than aggrieved at a verdict rendered against him by jurors so demeaning themselves, and a court which should fail to discountenance such conduct when brought to its attention would justly lose the esteem and confidence of all just men. If there was no other fact before me than the misconduct just mentioned, I should, with great reluctance, permit the verdict to stand. The example would, I fear, be infinitely mischievous. I should, therefore, dis-

carding all nice distinctions, feel inclined to put the seal of disapprobation in the most decided manner upon such misconduct by setting aside the verdict.

But there are other facts to be considered. It is shown to my entire satisfaction that Mr. W. H. Hope, a member of the Pool jury, in utter disregard of the instructions of the court, while the case was yet before the jury and undecided, talked freely and fully with Mr. G. W. Meredith about the case, expressing himself to the prejudice of the plaintiff and plaintiff's counsel. Meredith says Hope began the conversation without any question from him, and that he carried it on in a sneering way, saying, among other things, that "Hagerman had the court room full of Keokuk people, who, whenever he said anything, applauded, and that Keokuk thought they had got this thing fixed up very nice," etc. It is needless to say that there was no such thing as applause in the court room. Any such manifestation would have been very quickly suppressed. Hope, in his affidavit, denies this, but I am constrained, nevertheless, to credit Meredith's statement. Meredith, it seems, is a respectable farmer living in Van Buren county. His character is unquestioned. He appears to have no connection whatever with the plaintiff, and no interest in the litigation. What, therefore, could have moved him to fabricate such a statement as he has made and sworn to? What motive—what inducement had he to commit voluntary and gratuitous perjury? Meredith's testimony is positive and affirmative. If false, it was wilfully false. But Hope's denial is negative. He may possibly have forgotten what he did say to Meredith, or, at all events, he may have had but a very dim and indistinct recollection of the conversation. At any rate, Hope, finding his conduct as a juror called seriously in question, had a very strong motive for denying the truth of Meredith's statement, while Meredith had none whatever to make a false affidavit. It may be added that Hope was one of the jurors who, though not stopping at the Patterson House, was present with the rest at the card party there, and that we find him taking a decided and active part when the jury first retired for consultation.

Mr. Carter, a member of the jury, testifies that immediately after the jury retired for consultation, Hope moved that Palmer Clark act as foreman, which was carried. Another gentleman, who was also present with the card party, then moved that Hope act as secretary, which also prevailed. The balloting then commenced. It is remarkable that some one did not move the appointment of a committee to prepare and report a proper verdict to be adopted by the jury. That was all that seemed wanting to transplant the tactics of the veteran politician in full bloom from the caucus to the jury room!

There being no evidence in the affidavits before the court to implicate the defendant in the misconduct of the jury, counsel contends that the court ought not to set aside the verdict, because the misbehavior of the jury is no ground for granting a new trial where the successful party is not at fault, and when there is no prejudice to the losing party. And in this connection the counsel argue that the verdict was clearly right, and that no other verdict could have been rendered upon the evidence. There are certainly authorities to sustain this doctrine, and, with a proper understanding of what constitutes prejudice, I see no good objection to it.

But what is prejudice? Can the court say that where the jury misbehave, so that the losing party has not had a fair and impartial trial, there is no prejudice, because the court may be of opinion that the verdict is right? By no means; because the losing party is not bound to accept the judgment of the court: he is entitled to the verdict of an impartial jury. Suppose, in a criminal case, the jury should commit the fault of receiving information outside of court, and the judge should be of opinion that the conviction was clearly right, could the court pronounce that there was no prejudice to the prisoner, and therefore refuse him a new trial? Clearly not; and yet there is in this respect no distinction in principle between civil and criminal trials. The right to a fair and impartial trial by jury is the same in both. The true idea of prejudice in this connection was this: Was the misbehavior of the juror such as to make it probable that his mind was

influenced by it so as to render him an unfair and prejudiced juror?

Doubtless there may be cases of misbehavior in which the court could say without hesitation that the mind of the juror could not possibly have been affected by the misconduct imputed to him. Many illustrations may be found in the books of misbehavior without prejudice in this sense. Thus, if, after the jury should find their verdict and seal it up, and before its delivery in court a juror should talk with third persons about the merits of the case, there would be clearly misbehavior, but not prejudice in the proper sense of the word. The court might pronounce without hesitation that the communications made to the juror under such circumstances could not possibly have influenced him in finding the verdict. In such case there would be misconduct withou prejudice. But where the natural tendency of what a juror does or says or willingly listens to from others is to bias his mind, or where his misconduct evinces a prejudgment of the case, or ill-will, or passion against the losing party, the inference of prejudice in the true sense inevitably follows, because the verdict cannot be said to be the result of a fair trial. There is no right more sacred than the right to a fair trial. There is no wrong more grievous than the negation of that right. An unfair trial adds a deadly pang to the bitterness of defeat.

Now, the human mind is constituted so that what one himself publicly declares touching any controversy is much more potent in biasing his judgment and confirming his predilections than similar declarations which he may hear uttered by other persons. When most men commit themselves publicly to any fact, theory, or judgment they are too apt to stand by their own public declarations, in defiance of evidence. This pride of opinion and of consistency belongs to human nature. Where, therefore, a juror talks outside the jury room about a case pending and undecided before him, he gives the clearest evidence that he is not an impartial and unbiased juror. The very discussion of any matter by a juror elsewhere than in the jury room tends to the forming of false impressions and prejudgments. Nor will it do for a moment to accept the state-

ment of the juror that what he has said or heard has not affected or influenced his judgment.

Almost any juror, when detected in such misconduct and arraigned for it, will disclaim the influence upon his own mind of what he has uttered in violation of his duty. This is human nature. Moreover, few have either the capacity or candor to speak with any reliable certainty of the elements which enter into their own minds in pronouncing a judgment or verdict.

The only safe rule for the court to follow is to form its judgment from the natural and logical consequences of the juror's words and conduct, with little regard to his protestations in exculpation of himself.

All parties, and especially corporations, have a deep concern in keeping juries strictly to the line of duty and propriety. When they deviate from that line there is no longer any security against those malign, extrinsic influences which are sure to pervert and poison the streams of justice.

An order will be entered setting aside the verdict, and granting a new trial; and the court will consider a motion, if made, to rescind the order transferring the case to Keokuk for trial. It is quite evident that there is in that city a deep and all-pervading sympathy for this unfortunate plaintiff, whose home is among its citizens, and in whose sorrows they largely participate. Although this feeling is but natural and by no means discreditable to the citizens of that city, yet the manifestation of it at the trial was so marked and so unusual as to induce a belief that the ends of justice will probably be best subserved by a trial elsewhere.

McCRARY, C. J., having been of counsel, took no part in the case.