EWERS' ADM'R v. NATIONAL IMP. CO.

(Circuit Court, W. D. Virginia. April 2, 1894.)

1. NEW TRIAL—MISCONDUCT OF JUROR.
   Proof that while a case was pending, and before the testimony was concluded or the charge given, one of the jurors privately measured the distances testified to in the case, and told several persons that he had made up his mind, and would hold out for heavy damages, is ground for setting aside the verdict.

2. SAME—EVIDENCE—AFFIDAVITS OF JURORS.
   On motion for a new trial on the ground of misconduct of a juror, affidavits of fellow jurors are admissible to sustain the verdict.

Action by Ewers' administrator against the National Improvement Company. The verdict was rendered for the plaintiff, and defendant moves for a new trial.

Ford & Ford, for plaintiff.

Harrison & Long, for defendant.

PAUL, District Judge. This motion is based upon the following grounds, to wit: First, that the verdict is contrary to the law and the evidence; second, on account of the misconduct of a juror.

The court does not care to discuss the evidence in the case, as it is involved in the first ground, and will confine its views to the second ground, on which the motion is based. The charges against the juror, as contained in the affidavits filed by the defendant, are: That while the case was pending before the jury, and before the evidence was concluded, before the jury had received instructions from the court, and before the case had been argued by counsel, the juror, when separated from his fellows, had taken private measurement of distances testified to by witnesses in the case; had, in conversation with two different persons, at different places, about the same time, made himself the special champion of the character of the mother of the dead child, who was a witness in the case, the child being the same to recover damages for whose death this action was brought. There had been some criticism, the evening before, during the progress of the trial, of the conduct of the mother, Mrs. Ewers, on account, as was alleged, of her efforts to influence some of the witnesses in their testimony. The juror said to two persons that he believed her to be a lady. That he knew where she lived on Daniel's hill: To one he said he had been out on Rivermont bridge that morning, and could see her house; to the other he said he had gone over to Mrs. Ewers' house the evening before, to see her, but did not find her at home. To one of these persons he said: "Some of the witnesses had testified that the little girl was running down Sixth street, and some that she was not, but that it did not make any difference; that the car certainly struck her, and her mother ought to have some damages. He further stated that he had it all down in his mind then exactly what he would do. That a few days before that he had been on a jury that tried a man for counterfeiting money, and that he was the only man who stood bullheaded, and hung the jury." That conversation lasted 10 or 15 minutes.

To two other persons the juror said, immediately after a verdict had been rendered for the plaintiff, that he had talked during the trial to a man, not a witness in the case, who had seen the accident, and that the sight of the blood and bones had made the man sick so that he vomited. The juror Chewning, in an affidavit filed by counsel for the plaintiff, denies in great part the statements contained in the affidavits of Shelton and Jones, filed by the defendant. Under all the circumstances of this case, the corroboration of Shelton by Jones, etc., in several particulars, requires the court to receive the evidence of Shelton and Jones, rather than that of the juror. The juror admits what is stated in the affidavits of Krise and Burroughs. In his affidavit Chewning says he had made up his mind in the case before he had the conversations with Shelton and Jones, and counsel for the plaintiff file, in support of the juror's affidavit denying the charge of misconduct, the affidavits of several of his fellow jurors. While the rule is that the affidavits of jurors cannot be received to impeach their verdict, such affidavits may be received to sustain their verdict. Thomp. & M. Juries, § 446. These several jurors, with a view, manifestly, of sustaining their verdict (and to whom no misconduct is imputed), make oath that the juror Chewning, before the conversations set forth in the affidavits of Shelton and Jones, had expressed himself as in favor of heavy damages; "that he stated in their presence that he was made up in his mind for the plaintiff, and said that he would give a verdict for large damages; and that all this took place before the conversations with Shelton and Jones." With this evidence before us, there is but one conclusion at which the court can arrive; that is, that the misconduct of the juror evinces on his part a prejudgment of the case. He did not wait for the evidence to be fully introduced and concluded. He did not wait for the instructions of the court to be given to the jury as applying the law to the evidence in the case. He did not wait to hear the argument of counsel on the evidence, and the law as laid down by the court. But he makes a statement to an outside party to the effect that his mind is made up. He states in his own affidavit that at the time he talked to these outside parties he had already made up his mind as to his verdict. The plaintiff introduces the affidavits of his fellow jurors to prove that the conversations he had with outside parties had no influence with them in finding their verdict, and in the same affidavit his fellow jurors say that he (Chewning) had declared himself in favor of heavy damages before these conversations were had with outside parties. The prejudgment of a case by a juror could not be more clearly established, and the verdict in this case cannot be said to be the result of a fair trial.

In the language of the court in Pool v. Railroad Co. (Cir. Ct. U. S. Iowa) 2 McCreary, 251, 6 Fed. 844:

"There is no right more sacred than the right to a fair trial. There is no wrong more grievous than the negation of that right. An unfair trial adds a deadly pang to the bitterness of defeat. Now, the human mind is constituted so that what one himself publicly declares touching any controversy is much more potent in biasing his judgment and confirming his predilections

than similar declarations which he may hear uttered by another person. When most men commit themselves publicly to any fact, theory, or judgment, they are too apt to stand by their own public declarations in defiance of evidence. This pride of opinion and constancy belong to human nature. Where, therefore, a juryman talks outside of the jury room about a case pending and undetermined before him, he gives the clearest evidence that he is not an impartial juror. The very discussion of any matter anywhere by a juror elsewhere than in the jury room tends to the forming of false impressions and prejudgments. Nor will it do for a moment to accept the statement of the juror that what he has said or heard has not affected his judgment or influenced his verdict. Almost any juror, when detected in such misconduct, and arraigned for it, will disclaim the influence upon his own mind of what he has uttered in violation of his duty."

For the court, with the evidence before it, to allow this verdict to stand, would be a stigma on the administration of justice, and well calculated to destroy that confidence of litigants and the public in the fairness, impartiality, purity, and justice of jury trials, and their faith in the integrity of the courts, so essential to the maintenance of an honest, just, and effectual administration of the laws. An order will be entered setting aside the verdict and granting a new trial.