GEORGE R. KIRKPATRICK, RESPONDENT, v. AMERICAN CREOSOTING COMPANY, APPELLANT.—37 S. W. (2d) 997.

Kansas City Court of Appeals. February 16, 1931.

*C. A. Randolph* for respondent.

*P. E. Reeder, Clif Langsdale, David R. Derge* and *Winger, Reeder, Barker, Gumbiner & Hazard* for appellant.

BLAND, J.—This is an action for damages for personal injuries. There was a verdict and judgment in favor of the plaintiff and

against the defendant, American Creosoting Company, hereinafter called the defendant, in the sum of $5,000. Defendant has appealed. The following parts of the opinion written by Commissioner BARNETT, upon the original submission of the cause, are adopted by the court:

"Appellant is a corporation with its place of business in Jackson County, Missouri. It operates a creosoting plant, and, among other things, treats railroad ties with creosote. On December 23, 1924, plaintiff was an employee of the creosoting company and on that day he was helping to propel a tramcar loaded with ties. There was a narrow gauge track in the yards of the creosoting company's plant upon which certain cars were propelled by man power and which were used to convey railroad ties to and from appellant's retort sylinder where the ties were treated with creosote. Ties were loaded on a flat car which was equipped with certain bands or bails. The bails looped above the car like the staves of a covered wagon and were fastened at the bottom to iron pieces fastened to the sides of the car. The bails held the load of ties in such shape that the car and the ties would pass in and out of the tube-like interior of the retort. When the bails or bands were fitted over the ties they were made secure by a pin which fastened the ends of the bail to the iron pieces attached to the sides of the flat car. The regular pin furnished for this purpose projected very slightly, if at all. The track upon which the tramcar ran passed near a small building which covered a fire hydrant. This building was near to the track that the side of a loaded tram car would pass within six or seven inches of the side of the building so that a man could not safely pass between the loaded car and the hydrant house. There were no positive rules concerning what position a man should take when helping to propel a car; but a loaded car was usually propelled by four men. They could all stand behind the car and push or two could push at the back end of the car and two others could go to the front and there take hold of the front bail and thus pull or push on the load. It was not unusual for the men to pursue the latter course. Whenever a man walked on that side of a load which was nearest the hydrant house it was customary, upon reaching the hydrant house, to let loose of the bail, walk around the building, and again take hold after the hydrant house was passed.

On the day in question a box car had been placed on a loading dock in the defendant's yards in such a position that it was necessary to propel loads of ties past the hydrant house in order to deliver them to the box car for loading. Plaintiff had hold of the front bail on the car and was walking on the side nearest the hydrant house. According to the testimony most favorable to the plaintiff he was pulling on the load, and a man who was pulling rather than pushing was not in a position to see the pin which secured the bail.

When he came to the place where it was necessary to let loose and walk around behind the hydrant house he started to step aside but his clothing was caught and he was pulled into the space between the loaded car and the hydrant house and was thus injured. He testified that after he was injured he looked to see what caught his clothing and that he noticed that a piece of an auger bit had been used instead of the regular pin. The auger bit extended about an inch and was the only thing that could have caught and held his clothing. He testified that he had seen pieces of auger bits used instead of the regular pins; that he had observed this about once a week before he was injured. Plaintiff was working under the directions of defendant's foreman, one Charles W. Trask. It was Trask who had caused the box car to be placed where it was, who had ordered the load of ties to be pulled or pushed past the hydrant house to the place where they could be unloaded into the box car, and who had ordered plaintiff to do the work that he was doing.

Plaintiff brought this suit against the creosoting company and Trask jointly and in his petition alleged that the defendants were negligent (1) in causing and permitting the box car to be placed in a position where it would be necessary for the plaintiff and other employees to propel the trams or cars past the hydrant house, when there was ample space where the box car could have been placed without making it necessary to propel the tram past the hydrant house; (2) that the creosoting company was negligent in maintaining the tram line and the fire hydrant shed in close and dangerous proximity to each other; (3) that the creosoting company was negligent in failing to equip the tramcar with handles or handholds for the employee to hold in propelling or stopping the hand car; (4) that the creosoting company was negligent in failing to equip the hand car with a brake whereby the car when loaded might be stopped with reasonable safety; (5) that the creosoting company was negligent in equipping and maintaining the tramcar in a dangerous, defective and unsafe condition, in that a metal pin was caused and permitted to project from the side thereof and be exposed without a guard or other protection which was likely to catch the clothing of plaintiff and other employees; (6) that the defendants were negligent in failing to warn the plaintiff that the pin projected or protruded for such a distance that it was likely to catch in plaintiff's clothing; (7) that the creosoting company was negligent in failing to discover and remedy the defective condition of the pin. At the close of the evidence each defendant offered an instruction in the nature of a general demurrer to the evidence and both rquests were overruled. Thereafter the defendants offered no withdrawal instructions wherein they asked the court to instruct the jury that any allegation of negligence was withdrawn from their considera-

tion or that they must find for the defendants upon any allegation of negligence as a matter of law.

During the trial one of the attorneys for defendant offered in evidence a statement which had been signed by the plaintiff in which it was recited that at the time of plaintiff's injury he was pushing the car at the right front end. Having testified on direct examination that he was pulling the car, defendant's attorney on cross-examination asked plaintiff whether or not he had made the statement that he was pushing the car. Plaintiff denied that he had. There was quite a lengthy cross-examination during which the following occurred:

"A Juror: What is the date of that?

"Mr. Langsdale: There isn't any date on it. I don't know why.

"A Juror: Who was that made to?

"Mr. Langsdale: It was made to a representative of the defendant company.

"A Juror: Was it made in order to get back to work?

"Mr. Langsdale: No, sir, he was not working there.

"The Court: Gentlemen of the jury, the attorney cannot testify."

Defendant's attorney then asked six more questions concerning the manner in which the statement was made and taken, all of which were answered by the plaintiff, and another attorney for defendant then moved to discharge the jury for the reason that the juror had, by his remark, indicated that he was prejudiced and had already formed an opinion as to the statement without regarding the evidence in the case. The motion was overruled and exceptions taken. The jury returned a verdict for the plaintiff and against the defendant American Creosoting Company in the sum of $5,000, but in favor of the defendant Charles W. Trask. The creosoting company filed a motion for a new trial which, among other things, stated that the court erred in failing to discharge the jury on account of the juror who asked if the plaintiff's statement had been made in order to get back to work. Attached to the motion for new trial were two affidavits. Mr. P. E. Reeder, one of the attorneys for the creosoting company swore that Juror George A. Hackney, without warning, slid forward in his chair, and in an angry, belligerent, hostile and prejudicial manner, exclaimed: "Who was that made to?" referring to the plaintiff's signed statement; that "Clif Langsdale responded that it was made to a representative of the defendant company;" that thereupon said juror, in an even more violent, prejudiced, hostile, and belligerent manner, exclaimed,—"Was it made in order to get back to work?" Mr. Reeder's affidavit also stated that the conduct and demeanor of said juror indicated clearly that he was, at the time, biased and prejudiced and had made up his mind in the case adverse to the creosoting company, and assumed, without any evidence to warrant such a presumption, and before

the termination of the case, that the statement was obtained from the plaintiff by duress and pressure. The affidavit of David R. Derge, one of the attorneys for defendant creosoting company, was substantially to the same effect. The plaintiff filed the affidavits of all nine of the jurors who concurred in the verdict. All of these affidavits in substance stated that they regarded the questions of the juror as merely an honest inquiry to determine when the statement was signed, and when it later developed that it had not been signed in order for plaintiff to go back to work, affiant forgot all about the matter and did not think about it again until after the verdict when affiant was asked about the matter. Each affidavit stated that the questions were asked in ordinary tones without show of feeling or conviction on the part of the juror asking the questions; that the matter was not referred to at any discussion or deliberation of the jury, and affiant was not influenced in the slightest thereby in arriving at the verdict. The affidavit of George A. Hackney was to the effect that he only wanted to know whether or not the statement was signed at the time the plaintiff returned to work and that when it later developed just when the statement was signed and that plaintiff did not sign it in order to get back to work, affiant dismissed the matter entirely from his mind and did not think about it again until after the verdict when he was asked about the matter by plaintiff's counsel.

The evidence shows that after the plaintiff was injured he was taken home and remained in bed or propped up in a chair for several weeks. He started to work on February 4, 1925, one month and twelve days after the injury, as an employee of the Kansas City Bridge Company, where he did light work for about three weeks. He then went to Springfield where he spent several months, and in July, 1925, he went to work for the Kansas City Terra Cotta Company where he worked for about eleven months. He again went to work for defendant creosoting company in the summer of 1926. The motions in arrest and for new trial were overruled and the defendant creosoting company has appealed.

Respondent makes the contention in this court that the appellant has not filed a sufficient abstract of the record, and in support of this contention has filed an additional abstract of the record consisting of seventy-seven pages. In connection therewith respondent states that appellant has attempted to tell what it conceives to be the effect or purport of the testimony given by the various witnesses; that the abstract consists for the most part of mere conclusions, and that in many instances the true or proper purport of the testimony as it appears in the record is lost, changed, or rendered misleading; that in many instances appellant has omitted all references to important parts and sections of the testimony of various witnesses relating to and concerning matters of which appellant complains. It is further

stated that the additional abstract is not filed for the purpose of curing the defect in appellant's abstract or for supplying the omissions therefrom; that the additional abstract does not contain all the important portions of the record bearing upon the matters complained of by appellant and omitted from appellant's abstract. Appellant has filed a reply in which it denies that its abstract of record is insufficient.

OPINION.

We do not think that the appeal should be dismissed on account of the form of the appellant's abstract of the record. It is in narrative form and therefore only gives the substance of the testimony. The respondent stated that it did not file the additional abstract for the purpose of curing any defect in appellant's abstract. However, in so far as it supplies the defects it has that effect. The abstract cannot be criticized for only giving the substance of the testimony if, in reducing it to narrative form, the appellant has truly stated the substance. A great deal of the additional abstract only gives by question and answer that which fairly appears from appellant's abstract. There are a few instances where we think appellant's abstract was insufficient as shown by the matter set forth in respondent's abstract. We could not dismiss the appeal on the ground that not all of the evidence has been preserved, but would only be justified in refusing to pass upon the question as to whether or not the plaintiff made out a prima-facie case. The respondent complains of other alleged errors. As to such assignments of error, it is only necessary that the abstract set forth so much of the record as is necessary to a full understanding of the questions presented to this court for decision. Rule 15 of this court. It is true that respondent may attack an abstract of record which appears to be incomplete by filing a supplemental record which does not supply the deficiency. This does not mean that respondent does not cure the defect by setting out additional evidence not contained in the original abstract. If it is alleged in the additional abstract that exhibits 1, 2, 3, etc., were introduced in evidence but are not contained in the appellant's abstract but the exhibits are not printed by respondent, or that certain questions were asked and answered and the questions were set out but the answers omitted, this makes a prima-facie showing that not all of the evidence is before us. In so far as respondent's additional abstract shows that there was any evidence which was not included in appellant's abstract, the respondent supplies the omission. This being true, we should consider both the appellant's abstract and the additional abstract by the respondent as presenting all of the evidence in the case. [Platt v. Platt, 290 Mo. 686; Calkins v. Engle, 300 S. W. 997; Craven v.

Midland Milling Co., 228 S. W. 513; Dixon v. Thomas, 91 Mo. App. 364; Slovensky v. O'Reilly, 233 S. W. 478; In re Woods' Estate, 245 S. W. 368.]

Appellant contends that the court erred in refusing to give its instruction in the nature of a demurrer to the evidence because there is no direct evidence that respondent was caught on the auger bit on the tramcar in question and dragged between the car and the hydrant house, and also because the evidence showed that plaintiff was guilty of contributory negligence as a matter of law. We do not pass upon the question as to whether or not the circumstantial evidence was sufficient to show that plaintiff's clothes were caught on an auger bit nor upon the question as to whether plaintiff made a prima-facie case of negligence if the evidence did show that his clothes were caught upon the auger bit. The defendant offered an instruction in the nature of a general demurrer. Thereafter, without asking any withdrawal instructions, the defendants requested and the court gave an instruction that the burden of proof was on plaintiff to prove his case by the preponderance of the credible testimony and that unless the jury believed and found from the evidence that plaintiff had proved by a preponderance of the credible testimony that defendants were guilty of negligence as defined and submitted to them in the instructions of the court, and that such negligence, if so, was the direct and proximate cause of the plaintiff's injuries, then the verdict must be for the defendant. The court also gave an instruction for defendants that if the plaintiff, by the exercise of that degree of care which an ordinarily prudent workman exercises under like or similar circumstances, could have seen the auger bit, if any, and appreciated the danger, if any, of being caught and injured by the same, and that he could thereafter, by the exercise of ordinary care, avoided being caught and having his clothing caught by the same, if so, and that the failure, if any, to see the auger bit, if any, and the failure, if any, to appreciate the danger, if any, and the failure to avoid being caught and injured by the same directly contributed to his injury, if any, then the verdict should be for the defendants. It is firmly settled in this State that if a petition alleges several grounds of negligence as the cause of the injury for which plaintiff seeks to recover damages, and at the close of the evidence defendant asks for an instruction in the nature of a general demurrer which is overruled, and thereafter the defendants ask no instruction withdrawing the several allegations of negligence from the consideration of the jury, but joins with the plaintiff in submitting one or more of the grounds of negligence to the jury for their determination, the defendant is estopped to claim on motion for a new trial or appeal that there was no evidence upon which the jury could have rightfully found for the plaintiff upon the issues so submitted. [Torrance v. Pryor, 210

S. W. 430; State ex rel. Railroad Co. v. Allen, 308 Mo. 487; Packer v. Chicago, M. & St. P. Ry. Co., 265 S. W. 119; State v. Pigg, 247 S. W. 257; Ruenzi v. Payne, 208 Mo. App. 113, 231 S. W. 294; Motz v. Watson, 284 S. W. 837; Seewald v. Gentry, 220 Mo. App. 367, 286 S. W. 445; Leahy v. Winkel, 251 S. W. 483; Union Station Bank v. Wangler, 254 S. W. 739; Ramsey v. Mississippi River, etc., Co., 253 S. W. 1079; Harod v. St. Louis, San Francisco R. Co., 299 S. W. 74; Nickelson v. Cowan, 9 S. W. (2d) 534; Oberdan v. Evens-Howard Fire Brick Company, 296 S. W. 161.]

This doctrine is subject to limitations. If the petition only alleges one act of negligence, or, if it alleges several acts of negligence but further alleges that only one contributed to or resulted in plaintiff's injury, then a demurrer to the evidence which is general in terms is in fact specific, and such a demurrer is not waived by thereafter joining with the plaintiff in submitting the question to the jury. [State ex rel. Union Biscuit Co. v. Becker, 316 Mo. 865, 293 S. W. 783; Mills v. F. W. Steadley & Co., 279 S. W. 160.] When the evidence affirmatively disproves all of the allegations of negligence but one, so that the trial court must have understood that there was but one issue in the case, the demurrer, though general in terms, is treated as specific. [Goodson v. Schwandt, 300 S. W. 795.] When there is no evidence from which the jury may find a fact which is essential to support a recovery upon any and every theory pleaded in the petition, the general demurrer is not waived by submitting questions of fact to the jury after the demurrer is overruled. [Hoelker v. American Press, 317 Mo. 64, 296 S. W. 1008; McCaughen v. Mo. Pac. R. Co., 274 S. W. 97.] In this case there were many acts of negligence alleged. When the general demurrer was filed the trial court did not indicate which one or more of the acts of negligence he considered supported by substantial evidence. We therefore think that the case falls within the general rule and not within any of the exceptions; because the defendant, after the general demurrer was overruled, asked no instruction withdrawing the various allegations of negligence from the consideration of the jury, but asked instructions, some of which were given, which authorized the jury to determine whether or not defendant was negligent as a matter of fact. We cannot hold that plaintiff was guilty of negligence as a matter of law. If he did not know that there was a projection that was likely to catch in his clothes, he would not be guilty of negligence in failing to guard against it.

Appellant contends that the trial court erred in refusing to discharge the jury at the request of defendant on account of the fact that the questions asked by one of the jurors indicated that he was biased and prejudiced. The affidavits of the attorneys for the defendant attached to the motion for new trial stated that the questions were asked in a loud, angry tone of voice and in a manner in-

dicating the prejudice of the juror against the defendants. The affidavits of the nine jurors are to the effect that the question was asked in an ordinary tone of voice. Appellant contends that the affidavits of the jurors may not be considered in evidence because they have no right to divulge the deliberations of the jury. Even if this contention is sound (which we do not decide) yet what the jurors heard another juror say in open court is not information which they acquired in the course of their deliberations behind closed doors. They were as competent to testify to what happened in open court as any other person who was present. Furthermore, the trial judge himself heard what happened and could determine whether or not the juror, by his manner and tone of voice, indicated passion, prejudice or anger. The trial court overruled the motion for new trial, and we must assume that he would not have done so had he observed any evidence of passion or other improper feeling upon the part of the juror.

We cannot say that the question asked by the juror is itself sufficient evidence to indicate his bias or prejudice. The record shows that the plaintiff made a statement which was inconsistent with his testimony at the trial. It was shown that he again became an employee of the defendant sometime after he had received his injury. The statement was not dated. It was quite natural that the jurors should want to know when the statement was made. It was one of the things that a juror had a right to consider in determining whether he believed that the statement impeached the witness to the extent that he was unworthy of belief. The juror's first inquiry was as to the date of the statement. He was told that there was no date on the statement and that the attorney did not know why. The juror then asked to whom the statement had been made, and was told it was made to a representative of the defendant company. He then asked if it was made in order to get back to work. If it was, that fact would indicate that the statement had been made a long time after plaintiff had received his injuries. If the attorney in the case had been attempting to prove when the statement was made it is quite probable that he would have proceeded in his attempt to ascertain the approximate date of the statement in much the same way that the juror proceeded. We do not mean to say that it is clear to us that the juror was not anxious that some excuse for plaintiff's inconsistency should develop. We merely point out that there is more than one motive that could have prompted the juror to have asked the questions that he did. We therefore think that the question as to whether or not the jury should have been discharged was within the discretion of the trial court who saw the juror and observed his conduct and expression and who heard his tone of voice.

We have examined the cases cited by appellant and we do not think they would justify us in holding that the trial court abused

its discretion in refusing to discharge the jury. In the case of Ullom v. Griffith, 263 S. W. 876, a woman was asked a competent question. Instead of answering the question she began to cry. The court permitted the attorney to interrogate the jurors to determine whether her conduct had affected them. One of the jurors said:

"I don't feel any reason to put the question to her where it brings tears. I don't see any reason to put the questions to her where it puts her in tears."

This juror also said he thought it was the attorney's fault that the plaintiff was crying. The juror denied that he had been prejudiced by the occurrence, but his answers indicated plainly that he had been. He plainly indicated that he thought it was better to try the case without hearing the competent evidence than to cause the plaintiff to be reduced to tears. In the case of Chicago City Rys. Co. v. Brecher, 112 Ill. App. 106, the plaintiff, while upon the witness stand, was interrogated concerning a statement that he had made which was at variance with the testimony that he had given at the trial. A juror ascertained that the statement had not been signed or acknowledged before a notary public. He then said:

"What's the use of having that paper before us? I wouldn't trust it like this. There is no oath to it. I wouldn't recognize it. I don't see any sense in it to waste our time here for a piece of paper that has just only been made out down there between two men, and the witness don't know the parties, he can't tell what his address is. You can't tell what the paper has been made out of. I don't think it is of any use."

We do not need the aid of a trial court nor the opportunity to see gestures and expressions or hear the inflection of the voice to detect the unfair partisanship of a juror who would make a statement like the one quoted above.

In the case of Poole v. C. B. & Q. R. Co., 6 Fed. 844, the opinion was written by the district judge who granted a new trial on account of the misconduct of the jury. In the course of the opinion he made a finding of fact that the affidavit of the juror whose conduct was in question was false. It is sufficient to say that if the trial court in this case had made a finding that the affidavits of the nine jurors were false or had merely granted a new trial without indicating the reasons therefor, this court would have unhesitatingly sustained his action. In the case of Cooper v. Carr, 161 Mich. 405, and Farrington v. Cheponis, 73 Atl. 139, the verdict was set aside because of the misconduct of a juror in talking about the case during a recess and in the course of the conversation making remarks which showed beyond question that he had become prejudiced before the evidence had been concluded. We think that the discretion of the trial court in refusing to discharge the jury must be sustained upon the au-

thority of McGuire v. Amyx, 297 S. W. 968; Ownby v. K. C. Rys. Co., 228 S. W. 879.

Appellant contends that the court erred in admitting incompetent evidence on behalf of plaintiff to the effect that plaintiff had, for over a year before the time of the trial, been subject to blind spells or fainting spells. It is claimed that there are no allegations in the petition that such spells were the result of respondent's injuries and that plaintiff had received his injury over three years before the trial and evidence of blind spells or of fainting spells was too remote. No authorities are cited in support of this contention. The petition alleges that plaintiff suffered a violent shock to his nerves and nervous system; suffers from incoordination of his limbs and the muscles thereof; that he has suffered great physical pain and mental anguish; sleeplessness, dizziness, headaches; has become greatly debilitated and has lost his natural and normal strength. There are other allegations concerning the plaintiff's injury which are not pertinent to the question now under consideration. The record shows that when the plaintiff spoke of blind spells he did not intend to convey the impression that the use of his eyes were impaired, but rather that he had spells of dizziness and faintness. He swore that he would see small specks in front of his eyes and everything would get dark. We think that the allegations of the petition were broad enough to permit the introduction of this evidence. According to the evidence most favorable to plaintiff the dizzy or fainting spells were first noticed about eighteen months before the trial. However, before that time the plaintiff had manifested varying symptoms of disorder beginning with the date of his injury. The fact that his condition changed with the lapse of time is no reason why he could not be permitted to prove the history of his ailments from the time of his injury down to the time of the trial. If, at the close of all the evidence, one or more of his ailments were not sufficiently connected with his injuries to justify the jury in finding that they were the result thereof, then the defendant was entitled to an instruction to that effect upon request. [Powers v. K. C., 18 S. W. (2d) 545; Plummer v. City of Milan, 79 Mo. App. 439.]

It is contended that the court erred in refusing to permit the introduction of the records of St. Mary's Hospital wherein there was a record of a history given by the plaintiff to Dr. John J. Dorsey. Dr. Dorsey had operated upon plaintiff's thumb, at which time the doctor took a statement from the plaintiff concerning his prior physical condition. The doctor testified that the records of St. Mary's Hospital were made under his supervision and checked by him after they were written up, and the so-called history record was that which was given by the plaintiff to the house surgeon of St. Mary's Hospital, but had been submitted to him and by him checked and corrected. Dr. Dorsey was asked if he could refresh his memory from

the history and see what plaintiff had told about his history at the time. This was objected to on the ground that it appeared that the history had been given to the house surgeon and not to Dr. Dorsey. Dr. Dorsey was then asked if he had checked this history with the plaintiff. His answer was that he had a personal history that they took from the plaintiff and that he checked the hospital record against his personal history. Plaintiff's attorney then said:

"I object to that, let him use his own personal history." The doctor was then asked if he had the personal history with him, and he answered:

"I know it. I have it in my pocket over there. I have given all of the history so far as the personal history goes."

The record shows that the doctor testified without the aid of any memorandum and claimed that he was able to do so from his independent recollection. There was no error in refusing to permit the hospital record to be introduced in evidence. It was not a public record, but was a memorandum made by private individuals for their own use. The history did not purport to be a record made contemporaneously with the happening of the event which it purported to relate. Furthermore, it was not supported by the oath of the person who made out the record. [22 C. J. 902; Gribel v. Brooklyn Heights R. Co., 88 N. Y. S. 767, affirmed 184 N. Y. 528, 76 N. E. 1096; Levy v. J. L. Mott Iron Works, 127 N. Y. S. 506; Meyer v. Nassau Electric R. Co., 137 N. Y. S. 529; In re Barney, 174 N. Y. S. 242; Richardson v. Stringfellow, 100 Ala. 416, 14 So. 283.]

No error was committed in refusing to permit the doctor to refresh his memory from the hospital record; because, according to his own testimony, it was not his memorandum. He had made his own memorandum and he merely ascertained that the memorandum made by the house surgeon was correct by comparing it with his own. The court did not refuse to permit him to refresh his memory from his own memorandum; but the doctor did not do so because his independent recollection was clear. The record shows that the doctor testified to all that he would have remembered had he consulted the memorandum.

It is claimed that the court erred in giving plaintiff's Instruction No. 1. By that instruction the court directed a verdict for plaintiff if the jury found that the tramcar was rendered not reasonably safe because it was equipped with a metal pin or rod which projected for such distance that the same was likely to catch in plaintiff's clothing and drag him between the moving tram and the hydrant house, and if defendant knew or by ordinary care could have known of the presence of such pin in time with ordinary care on its part to have remedied the condition or to have warned the plaintiff thereof, but that defendant failed to exercise ordinary care to discover and remedy the condition, and failed to exercise ordinary care to

warn plaintiff thereof, and that such failure in both respects constituted negligence, etc. It is claimed that by this instruction the court failed to put to the jury the question as to whether or not the danger of the projecting auger bit was a simple and obvious danger which would have been discovered by the respondent. The instruction is in the conjunctive in the sense that it requires the jury to find that defendant creosoting company failed to exercise ordinary care to discover and remedy the condition, and also failed to exercise ordinary care to warn the plaintiff thereof. But it is disjunctive in that it requires the jury to find that by ordinary care defendant could have known of the presence of the pin in time to have remedied the condition or to have warned the plaintiff thereof. The theory of the instruction is that if the presence of the auger bit made the situation dangerous and the defendant had knowledge or was chargeable with knowledge thereof, then it was the duty of the defendant, either to remedy the situation or to warn the plaintiff of the danger. The jury might have found that the danger of catching one's clothes upon objects projecting from the side of the car was not so great but what the work could have been conducted with reasonable safety and that the defendant could not be expected to keep the sides of the car so smooth that it would be impossible for a man to catch his clothing. Splinters on the ties might catch in a man's clothing; yet no one would contend that the presence of splinters on railroad ties was such a danger that the master would be negligent if it ordered the ties transported without first removing the splinters. The jury might have believed that the fact that a pin extended an inch on the side of the car would not be dangerous to one who knew of its existence; that a workman could protect himself from such a projection with the very slightest effort. If so, the pin was not dangerous at all unless it was made so by reason of the fact that it was at a place where its presence would not be expected. This is the theory upon which the plaintiff put his case to the jury. There is no duty to warn if the danger is obvious and easily avoided. [Rodney v. St. Louis, etc., R. Co., 127 Mo. 676; Hearon v. Himmelberger-Harrison Lbr. Co., 206 Mo. App. 463, 230 S. W. 661; Clark v. Wheelock, 293 S. W. 456; Norwood v. St. Louis-San Francisco R. Co., 296 S. W. 222; Piorkowski v. Leschen & Sons Rope Co., 190 Mo. App. 597; Hirsch v. Bread Co., 150 Mo. App. 162; Braden v. C. B. & Q. R. Co., 174 Mo. App. 584; Nugent v. Kaufman Milling Co., 131 Mo. 241; Herbert v. Mound City Boot Shoe Co., 90 Mo. App. 305; Ring v. Mo. Pac. R. Co., 112 Mo. 220; 39 C. J. 499-500.] The plaintiff admitted that he had seen auger bits used in place of the regular pin on an average of once a week. When looking to see what caught in his clothes he saw the auger bit immediately. Under the circumstances it was a question for the jury to determine whether or not the danger was simple and obvious.

It does not follow that the instruction was erroneous; because by that instruction the jury was required to find that the defendant was negligent in other respects. Whether the other acts did in fact constitute negligence we do not consider; because that would be to pass upon the questions which should have been saved by offering withdrawal instructions.

Complaint is made of the refusal of the court to give defendant's Instruction I-i. By that instruction defendant sought to have the court tell the jury that it was not the duty of defendant to warn the plaintiff of simple and obvious dangers, which an ordinarily prudent workman could have discovered himself by the exercise of ordinary care, and that if they found that the plaintiff, by the exercise of ordinary care, could have seen the auger bit, if any, and could have appreciated the danger, if any, of being caught by same, and injured, and that he could, thereafter, by the exercise of ordinary care, avoided being injured by reason of the same, then their verdict should be for the defendant. The parties do not agree upon the construction to be given this instruction. Defendant says that it is solely upon the question of duty to warn, while plaintiff states that it is upon contributory negligence and as contributory negligence was not pleaded and, as that part of the Instruction No. 1 submitting contributory negligence was inserted by the court and, consequently, it cannot be said that plaintiff tried the case upon the theory that contributory negligence was pleaded, the instruction was properly refused. Assuming that the instruction is solely upon the question of duty to warn, it was properly refused. The cause was submitted in Instruction No. 1 upon various acts of negligence, aside from the failure to warn, and Instruction I-i is not confined to having the jury find the issue of failure to warn in favor of defendant but directs, upon the facts submitted therein, a finding for defendant on all of the issues. [Beeson v. Fleming, 285 S. W. 708; Unterlachner v. Wells, 278 S. W. 79.]

Defendant introduced evidence tending to show that plaintiff was pushing and not pulling on the bail and plaintiff, himself, testified that, had he been pushing upon the bail or tram, the auger bit could not have caught in his clothes as he would have been to the rear of the bit, whereas, in pulling, he was in front of it. In this connection defendant offered its Instruction F, the refusal of which complaint is made as well as of the giving of the instruction by the court as amended. Said instruction as given reads as follows (the amendment appearing in italics):

"The court instructs the jury that if you find and believe from the evidence that the plaintiff was pushing on the bail or tram mentioned in the evidence at and prior to the time that he got between the loaded tram and the fire hydrant house, if so, and that he was not pulling on said tram or bail at said times, *and he was not caught*

*by a metal pin or rod projecting from said tram* then your verdict will be for the defendants.'' (Italics ours.)

The refusal of the instruction as offered was not error for the reason that plaintiff's Instruction No. I requires the jury to find that plaintiff was pulling on the tram or bail and defendant's offered Instruction F was equivalent to submitting, or attempting to submit, that issue in a negative form. [Doody v. California, 216 S. W. 531; Anderson v. Davis, 284 S. W. 439, 454; McCaffery v. St. L. & M. Ry. Co., 192 Mo. 144, 159.]

It is true that defendant has a right to have its defenses fully and clearly presented to the jury in its instructions, provided the particular matter is not properly covered by other instructions (Jennings v. Cooper, 230 S. W. 325; Stephens v. Eldorado Springs, 185 Mo. App. 464; Webb v. Byrd, 203 Mo. App. 589; Root v. Railroad, 237 Mo. 640) but it is not entitled, as a matter of right, to have an issue submitted merely in a negative form. [See cases cited on this point.]

Defendant insists that on account of the Instruction No. I being long and covering a number of matters it was entitled to its Instruction F in order to clarify the matter. It is true that plaintiff's Instruction No. I is quite long and covers a number of matters but it requires the jury to find, in several places, that plaintiff was pulling on the bail and we do not think that the jury could have failed to understand it.

It is claimed that the instruction, as amended, is erroneous because it, in effect, ''told the jury that he (plaintiff) could recover whether he was pushing or pulling the tram or bail, provided he was caught by the metal pin or auger bit.'' We do not so read the instruction. The instruction says, in substance, that if the jury found that plaintiff was not pulling, or in other words, pushing, and was not caught by the pin, he was not entitled to recover.

The addition of the matter that the court made to the instruction, of itself, if found by the jury, would authorize a verdict for the defendant. In this connection we think that the instruction was very favorable to defendant as it comes very near to intimating to the jury that it was the opinion of the court that plaintiff was not pulling on the tram or bail, for it emphasizes the question of his not pulling by mentioning the matter in two different ways: (1st) that he was pushing, and (2nd) that he was not pulling. It then submits the matter of whether or not he was caught by the metal pin, which, as before stated, if decided in the negative, was sufficient of itself to require a verdict for defendant. However, it is not necessary for us to pass upon the question as to whether the given instruction was a comment upon the evidence, as the verdict was for the plaintiff. However, we do believe that the instruction was as favorable to the defendant as it was entitled to demand.

It is claimed that the verdict is excessive. The facts, in reference to this matter, show that plaintiff was caught between the moving tram, weighing about 11,000 pounds, and the hydrant house. He was rolled in a six-inch space and bruised badly. He was squeezed with such force as to cave in the boards of the house, splitting some of the tongues and grooves of the boards, and dislodging a two by four stringer inside the hydrant house. He lost consciousness for a short time. Two of his ribs were fractured. His left side was pressed against his internal organs, twisting and rotating his second, third and fourth vertebrae to the right and fracturing the first dorsal spinal process. He sustained a sacroiliac sprain. Since the time of his injuries he has suffered from dizzy spells and pains in his left side and lower back. He suffers from weakness in his arms and legs. He drags his left foot when going up and down stairs. If he does not watch carefully where he is going he strikes objects with his left foot. He does not have full sensation in his left leg from the hip half way down the leg. He suffers from incoordination of his hands and has trouble lifting his hand. He has impairment of the sensory nerves, especially in the left side and lower extremity. He has a pressure on the left plura and lung where the coverings are attached together, resulting in some congestion and restricted breathing, as well as pain. The spacing between the vertebrae is abnormally wide. One of his physicians testified that in his opinion: ''The condition of adhesions to the lungs, the condition of the dorsal vertebrae, the rotation of the spine and the condition of the lower back were permanent.''

Following the receipt of the injury plaintiff spit up blood for a week. He passed blood in his urin shortly after he returned to hard work. He was in bed and a chair three or four weeks. He first attempted to work, which consisted of some light labor, six or seven weeks after the accident. He worked at this for three weeks. In July, 1925, he went to work for the Kansas City Terra Cotta Company where he did light work repairing defects in terra cotta. He did not return to any work of a heavy nature until July, 1926, or for a year and one-half after the receipt of his injuries. At the time of the trial, which was more than three years after the casualty, the heavy work, in which he had been engaged, caused him pain and at times he was required to ''catch hold of a car or something to support himself and did his work in misery.'' At the time of the receipt of the injury he was earning $35 per week and when doing light work he received from forty to fifty cents per hour. Beginning with May, 1927, he received an average of $37.50 per week. It is quite apparent that, aside from sustaining a severe injury, plaintiff has lost a considerable amount of money in wages. We cannot say, under all of the circumstances, that the verdict is so great as to warrant an interference with it by this court.

The judgment is affirmed. *Arnold, J.,* concurs; *Trimble, P. J.,* absent.