JOHN McGRAW, Respondent, v. HENRY O'NEIL et al., Appellants.

Kansas City Court of Appeals, March 4, 1907.

1. **CHATTEL MORTGAGE: Seizure: Default: Conduct of Mortgagor.** The mortgagee has no right to seize the mortgaged property before default in the payment of the debt and the mortgagor's conduct in failing to answer letters, however inexplicable, cannot justify such seizure.

2. **———: Surrender: Evidence: Jury.** Though the mortgagee has no right to enforce the lien of the mortgage in the absence of condition broken, yet he can receive a voluntary surrender of the mortgaged property from the mortgagor; and where there is conflicting evidence as to such surrender the finding of the jury in the absence of mistake of law by the court will be binding.

3. **———: ———: ———: Principal and Agent: Power of Disposal.** After a witness has detailed the conditions and actions of the mortgagor's agent in charge of the mortgaged property he cannot state who appeared to be in control of the mortgaged goods, especially where the fact of control is admitted and the object of the evidence is to raise from the apparent control the inference of the power of disposal.

4. **Damages: Measure of: Mortgaged Cattle: Feeders: Evidence.** The price brought on the market is not the only measure of damage for the conversion of mortgaged cattle where the evidence shows that the sale was at one place and the conversion at another and that the cattle were feeders and not ready for the market.

5. **———: Excessive Verdict: Remittitur: Presumption; Prejudice.** Presumption is strongly in favor of the right action of the jury and that any excess in the verdict is the result of honest mistake; and where the verdict has received the sanction of the trial court it is attended with the further presumption that the judge exercised his discretion soundly and saw nothing to convince him of passion or prejudice.

6. **———: ———: ———: ———: ———: Appellate Practice.** Such presumptions, however, do not bind the appellate court, and where that court is convinced that the excess in the verdict is but one manifestation of passion or prejudice, it will set aside the verdict.

7. ———: ———: ———: ———: ———: ———: **Rule.** Where the judge placing himself in the jury box finds that the mistake could have been honestly made, he must affirm the judgment, and where he finds that no honest or reasonable mind could have fallen into the error under any reasonable view of the evidence, he must hold the verdict the offspring of improper motives and such vice cannot be cured by mere remittitur, but only by a new trial.

8. ———: ———: ———: ———: ———: ———: **Evidence.** The evidence relating to a mistake of $1,600 attempted to be cured by remittitur is reviewed, and it is held that the mistake was honestly made and the verdict is upheld.

9. **TRIAL PRACTICE: Misconduct of Parties: Verdict.** Mere attempt of parties to tamper with the jurors will vitiate the verdict, since such rule is necessary to preserve the purity of jury trials; but mere accident or inadvertence without any design and which fails to influence the verdict, should not disturb the result.

10. ———: ———: ———: **Court's Discretion.** Evidence relating to certain conversations of plaintiff with the jurors during intermissions of court is reviewed and held to have been without design and to have had no influence on the verdict, which is approved, since it received the sanction of the trial court, which has large discretion in such matters.

Appeal from Jackson Circuit Court.—*Hon. Shannon C. Douglass,* Judge.

AFFIRMED.

*Haff & Michaels* and *L. W. McCandless* for appellants.

(1) An excessive verdict may sometimes be cured by remittitur; but there are exceptional cases including such excessive verdicts as in the case at bar, where the excess in a verdict is not curable by remittitur. Hewitt v. Steele, 118 Mo. 474; Watt v. Watt, L. R., App. Cas. 115; Gurley v. Railroad, 104 Mo. 233; Burdict v. Railroad, 123 Mo. 238; Rodney v. Railroad, 127 Mo. 693; Chitty v. Railroad, 148 Mo. 77, 166 Mo. 435; Smoot v. Kansas City, 92 S. W. 365; Ice Co. v. Tamm, 90 Mo.

App. 200; Sheedy v. Brick Works, 25 Mo. App. 531; Clark v. Ins. Co., 61 Mo. App. 185; Malloy v. Railroad, 173 Mo. 85; Bolton v. Railroad, 172 Mo. 105; Longan v. Weltmer, 180 Mo. 335; Hollenbeck v. Railroad, 141 Mo. 112; Perrette v. Kansas City, 162 Mo. 253; Doty v. Steinberg, 25 Mo. App. 334; Unterberger v. Scharff, 51 Mo. App. 109; Pritchard v. Hewitt, 91 Mo. 550; Koeltz v. Bleckman, 46 Mo. 321; Matthews v. Railroad, 26 Mo. App. 86; Watson v. Harmon, 85 Mo. 446; State to use v. Frank, 22 Mo. App. 46; Stocke v. Albert, 8 Mo. App. 577; Lee v. George Knapp & Co., 137 Mo. 392; Spiro v. Transit Co., 102 Mo. App. 266; Spring Co. v. Tool Co., 103 Mo. App. 109; Russell v. Cassidy, 108 Mo. App. 581; Helm v. Railroad, 98 Mo. App. 426; Fury v. Merriman, 45 Mo. 501; Pratt v. Blakey, 5 Mo. 208; Porter v. Railroad, 71 Mo. 83; Friedman v. Pub. Co., 102 Mo. App. 695; Hipsley v. Railroad, 88 Mo. 353; Ensor v. Smith, 57 Mo. App. 584; Powell v. Railroad, 59 Mo. App. 340; Empey v. Cable Co., 45 Mo. App. 425; Helm v. Bassett, 9 Mo. 54.   (2)   McGraw was guilty of such misconduct towards the jury as to require a retrial of this cause.   Tatlow v. Grantham, 66 Mo. App. 512; Kennedy v. Holladay, 105 Mo. 34.   (3)   The trial court erred when it refused to permit appellant O'Neill to testify who appeared to be "in control" of the cattle here in question at the date of the alleged conversion.   Iron Co. v. Roberts, 87 Ala. 441; Locke v. Hedrick, 24 Kan. 765; Farrell v. United States, 110 Fed. 943.

*Boyle, Guthrie & Smith* for respondent.

Filed argument.

JOHNSON, J.—Action to recover damages for the conversion of personal property.   Plaintiff had judgment and an appeal was allowed defendants to the Supreme Court, but on motion therein filed the cause was transferred to this court on the ground that the Supreme

Court had no jurisdiction over it. After recovering judgment in the trial court, the plaintiff, John McGraw, died and the action now stands revived in the name of the administrator of his estate.

The facts necessary to a proper understanding of the case thus may be stated. Mr. McGraw, who was a farmer and stockman living in Kentucky, bought two hundred head of cattle for feeding purposes from defendant commission company, a dealer in live stock at the stockyards in Kansas City, gave his promissory note in payment of the purchase price and secured the same by chattel mortgage on the cattle. The commission company sold and transferred the note to a bank in Quincy, Illinois, and by indorsement became bound for its payment. When the note matured, the loan by agreement of all the parties in interest was extended and a renewal note and mortgage were executed and delivered to the commission company and in turn indorsed and delivered to the Quincy Bank. This note was dated March 3, 1902, and by its terms matured (without grace) on September 3d following. After buying the cattle, McGraw removed them to a ranch he owned in Cowley county, Kansas, and they were there at the time of the alleged conversion. A month or more before the maturity of the note, the commission company learned from the broker in Kansas City, who represented the Quincy Bank in the transaction, that payment of the note would be required on the date of maturity and witnesses for defendants testified that several letters were written and mailed by the commission company to plaintiff, some directed to his address in Kentucky and others to the ranch in Kansas, informing him of the fact that the note would have to be paid. Receiving no answer to these communications and becoming alarmed over the prospect of having to protect its indorsement, the commission company resolved to take possession of the cattle under the chattel mortgage, ship them to Kansas City and sell them on

the market. Accordingly, defendant O'Neil, who was manager of the commission company, went to the Kansas ranch, found plaintiff's foreman in charge thereof, demanded and received possession of the cattle from him and shipped them to Kansas City. This was done in the last days of August, a few days before the note fell due. The cattle were sold on the market at Kansas City on September 3rd, the date of the maturity of the note and brought a sufficient amount to pay the note in full together with the expenses incurred by defendant's and leave a remainder of about $1,100. Defendants paid the amount due on the note to the Kansas City broker, who accepted and remitted the money to the Quincy bank, where it was retained and applied in payment of the note. On September 5th, plaintiff appeared at the office of defendant commission company in Kansas City, was informed of what had been done with his cattle, and was offered the remainder of the proceeds of the sale, but declined it and this suit followed.

The foregoing statement is taken from the evidence adduced by defendants. On the part of plaintiff evidence was introduced tending to show that he received none of the letters which defendants claim to have mailed him on the subject of the approaching necessity of paying the note. As the day of payment drew near, plaintiff then at his home in Kentucky wrote and afterwards telegraphed to a Mr. Peters, who had been an officer of defendant commission company, relative to an extension of the note. Mr. Peters had conducted for the company the preceding transactions with plaintiff and on that account plaintiff addressed him personally. Unfortunately, Mr. Peters had withdrawn from the company and was engaged in a political campaign when plaintiff attempted to correspond with him. Nothing resulted from the attempt and a day or two before the note matured plaintiff on a direct application to the Quincy bank obtained an extension of the time of pay-

McGraw v. O'Neil.

ment by having the bank in Kentucky with which he did business guarantee the payment of the note to the Quincy bank. After this was accomplished, plaintiff went to Kansas City where for the first time he learned that his cattle had been seized and sold by defendants.

The petition sufficiently states a cause of action in the nature of trover. In the answer is a general denial; a plea that the cattle were voluntarily delivered to defendants by plaintiff's agent who it is alleged was duly authorized thus to dispose of them, and a counterclaim for the amount defendants paid in satisfaction of plaintiff's note with interest thereon.

The issues of fact submitted to the jury are thus defined in the only instruction given on behalf of plaintiff. "You are instructed that the plaintiff is entitled under the pleadings and uncontradicted evidence in this case to recover a verdict against the defendant for the fair market value at the time and place where taken of the one hundred and ninety-five head of cattle, taken by the defendants on September 1, 1902, and you may, if you think fit, give damages in the nature of interest at six per cent per annum, from that time, over and above the value of the cattle, at the time and place of seizure, unless you find that the plaintiff, or somebody authorized by him, authorized the defendants to take possession of, and sell the cattle before they were taken possession of and sold, or that the plaintiff subsequently to the time of the sale of the cattle, ratified and acquiesced in, and thereby consented to the sale of such cattle."

Numerous instructions were asked by defendants, but the questions of law urged on our attention do not call for special reference to them. The jury found for plaintiff on the cause of action pleaded in the petition and assessed his damages at $11,472.81, and found for defendants on their counterclaim in the sum of $7,643. Owing to a mistake made in subtraction, judgment was entered on this verdict for plaintiff for $3,729.81, when

it should have been for $100 more.  Motions for a new trial and in arrest of judgment were duly filed, but before they were determined plaintiff voluntarily entered a remittitur in the sum of $1,500.  The motions then were overruled and the judgment now stands at $2,229.81.

It does not appear that the Quincy bank, the holder of the note and mortgage, directed or authorized defendants to act as its representative in taking possession of the cattle and selling them.  Defendant O'Neil testified that he told the bank's broker at Kansas City of his intention to seize and sell the property, but he did not ask permission to act for the bank, nor is it shown that the broker had authority to grant such permission had it been asked.  Defendants apparently acted on the presumption that they could exercise the rights of the mortgagee without authority from the owner of the note and mortgage and in this were supported by a provision in the mortgage which evidently was designed to clothe the defendant commission company with such right in the event it sold and assigned the paper.  But the questions presented for our determination do not require a construction of this provision and in disposing of them we may assume for argument that defendants, after condition broken by the mortgagor, could proceed under the terms of the mortgage to take possession of the property and sell it as therein provided without special authority from the owner of the debt and  mortgage.

But with this right conceded, defendants certainly had no right to seize the cattle against the will of the mortgagor before the maturity of the note merely because they feared he would fail to pay the debt at the appointed time and thereby cast the burden on the commission company of discharging its liability as indorser. His seemingly inexplicable conduct in failing to answer their letters may have justified defendants in apprehending that he would fail to pay the note, but, however well-

founded were their fears, they should have kept hands off until the default occurred. The mortgagor was under no legal compulsion to answer their letters and they had no right to proceed against him or the mortgaged property until there was an actual default. In dealing directly with the owner of the note and mortgage for an extension of the time of payment, the mortgagor was acting within legal right and the agreement he procured for such extension before the note matured prevented the occurrence of default on account of nonpayment during the period covered by the extension.

Though, as we have just shown, neither the owner of the mortgage nor defendants had any right, in the absence of condition broken, to enforce the lien of the mortgage, they could receive a voluntary surrender of the possession of the property from the mortgagor at any time before or after the date fixed for payment and it was the contention of defendants at the trial that plaintiff through his agent, the foreman of the Kansas ranch, willingly and without any sort of compulsion delivered possession of the cattle to defendant O'Neil, assisted him in shipping them to Kansas City and agreed that defendant should sell them on the market and apply the proceeds as directed in the mortgage. In effect, it was conceded by plaintiff that his foreman did all of these things, but plaintiff denied the authority of the foreman thus to dispose of his property and the evidence adduced by both parties on the subject of the agent's authority made of it an issue of fact which the instruction quoted shows the court submitted to the jury and which was determined by that body in favor of plaintiff. We must regard that issue as settled by the verdict unless we find that the court committed error in its rulings relating to the admission of evidence offered on that issue.

The only error of this character claimed by defendants relates to the testimony of defendant O'Neil.

After stating fully in his direct and cross-examination what he observed during his stay at the ranch and what transpired between him and the foreman, Breniger, he was interrogated by his counsel on redirect-examination as follows: "Q. Who, if anybody, appeared to be in control of the cattle at Hoosier when you went there? Objected to as calling for the conclusion of the witness. Counsel for defendants: The inquiry is as to the authority and control of this man, Breniger. The Court: I think he has stated what Breniger was doing and that is about as far as he can go." The gist of defendants' argument is that the answer sought to be elicited, that Breniger was the man who appeared to be in control of the cattle, would have had a direct evidentiary bearing on the question of the extent of the authority plaintiff had conferred on Breniger. We may concede that as it appeared the witness had spent several days on the ranch under circumstances affording him full means of knowledge of the situation, there, he was in a position to know who was in charge of the cattle and had that fact been a subject of controversy between the parties the question would have been proper since it called for the statement of a fact which, though partly the result of conclusion, necessarily could and would be inferred by any reasonable mind from the facts and circumstances in the knowledge of the witness. [Council v. Railroad, 123 Mo. App. 432; Woodstock Iron Co. v. Roberts, 87 Ala. 436; Locke v. Hedrick, 24 Kan. 763; Farrell v. United States, 110 Fed. 942.]

But the fact that Breniger was in charge of the cattle as the agent of plaintiff was admitted by plaintiff and therefore was not in issue. There was no need to admit evidence to prove a conceded fact and the court did not err in sustaining the objection unless it should be said that the answer to the question would have possessed probative force tending to show that Breniger had authority from plaintiff to deliver the possession of

the cattle to the witness. The question of the extent of the authority of the agent was treated by both parties and the court as a vital issue and doubtless the main purpose of counsel in asking the question was to build on the anticipated answer the argument that the "appearance of control" carried with it the power of disposal. Plaintiff testified that Breniger was employed at a salary of $40 per month as a mere caretaker of the cattle and had not been given any authority to sell or otherwise to dispose of them. Defendants, to show that the agent possessed greater authority than that stated by plaintiff, offered no other evidence than the facts and circumstances that came under the observation of the witness during his visit to the ranch. These the witness fully detailed in his testimony. In brief, they show that O'Neil, who knew that plaintiff was the owner of the cattle and that he had left them in charge of a foreman, went to the ranch, demanded possession of the property of the foreman, suggested to him that he telegraph plaintiff the information that the cattle had been seized by defendants and would be shipped and sold, and then procured the services of the foreman in shipping them to Kansas City. These acts of the foreman performed under the stress of a demand which evidently he understood was supported by legal right, considered in the light of admitted facts and circumstances, do not justify the inference that the foreman possessed the authority in question.

The only authority to be implied from the fact of his possession of the cattle as a ranch foreman was authority to perform acts incidental to properly caring for them. His submission to the demand of the witness was clearly beyond the apparent as well as the actual scope of his employment and therefore was *ultra vires*. Being outside the apparent scope of his employment, it devolved on defendants to show by evidence *aliunde* the acts of the agent that he was actually invested with the

special power he assumed to exercise. The conclusion of the witness based entirely on the acts of the agent— for he admits having no other means of knowledge—even if it should be treated as the statement of a collective fact, could possess no greater evidentiary value than that inhering in its basic facts and these relating solely to the acts of the agent could not serve to enlarge his authority beyond its apparent scope. The objection to the question was properly sustained. [Farrell v. United States, supra; Advertising Co. v. Wanamaker, 115 Mo. App. 270; Willard v. Gas Fixture Co., 47 Mo. App. 1; Henson v. Mercantile Co., 48 Mo. App. 214; Knoche v. Whiteman, 86 Mo. App. 568; Dellecella v. Harmonie Club, 34 Mo. App. 179; Brown v. Railway, 67 Mo. 122.]

Another point made by defendants is that the finding in the verdict of the amount of plaintiff's damages is so clearly excessive that it must be deemed to be the result of passion or prejudice on the part of the jury. Defendants at the trial endeavored to minimize the damages by showing that they received full market value for the cattle in the sale made at Kansas City and that the Kansas City market controlled the value of such cattle in Cowley county, Kansas. On the other hand, it was shown that the cattle are what is known as "feeders," that is, they were not ready for slaughter, but required fattening to place them in condition for consumption and that for this class of cattle values in Cowley county, though influenced to some extent by the market prices prevailing at the packing centers, were not controlled by such prices, but were determined by the interaction of all of the conditions obtaining in what may be termed a cattle feeding district. The court in the instruction quoted entertained the view that the damages were to be measured by the market value of the cattle in Cowley county at the time of their seizure by defendants. The correctness of this rule is not now challenged by defendants, but the ground of the present complaint is that

the estimate of value made by the jury as expressed in the verdict so greatly exceeds that made by any of plaintiff's witnesses that it discloses a purpose on the part of the jury to punish defendants in addition to compensating plaintiff for the actual damage he sustained.

The remission by plaintiff of $1,600 from the face of the verdict must be regarded as an admission by him that to that extent the verdict was unsupported by evidence. As was well said in Hewitt v. Steele, 118 Mo. 463, "Litigants are not so magnanimous, as a general rule, as to remit any part of verdicts in their favor which their counsel know and advise them are not excessive and that such verdicts will not be set aside on that ground."

In the computations we have made from the estimates of weight and value per hundred pounds made by plaintiff's witnesses, we find, after making allowance for the inclusion of interest from the date of conversion, that the verdict exceeded the amount of actual damages suffered by plaintiff, by approximately the amount of the remittitur so that the fact of an excess in the verdict of the amount stated being clearly demonstrated by the evidence and admitted by plaintiff may be assumed as indubitable.

Counsel for defendants in an able and exhaustive brief have collected and reviewed the decisions in this State bearing on the subject under consideration and, conceiving that some of the rules which now may be considered as settled in our jurisprudence are too vague and inaccurate for practical and uniform use, endeavor to have us formulate them in a way to uphold defendant's contention that the entire verdict should be set aside as a thing infected with the vice of a breach of duty on the part of the jury. The rule is too well settled to be open to controversy that the discretion which the trial judge may exercise in the supervision of the verdicts of juries includes the right to compel the victorious party to remit a part of the verdict as the price of escaping the haz-

ard and expense of another trial. This, the judge may do in any case where the excess either is entirely unsupported by evidence or is against the weight of the evidence and where it appears to be the result of an honest mistake on the part of the jury and not the product of a willful disregard of duty. The presumption always is strongly in favor of right acting on the part of the jury and as mistakes in the amounts of verdicts are so often compatible with an honest and pure motive and even with a fair understanding of the evidence, the fact that such mistake has been made, save in exceptional cases, is not even an indication of passion or prejudice. What the trial judge may require the successful party to do, if he would hold a part of the advantage gained, he may voluntarily do for himself and where he enters a remittitur either of his own volition or under judicial stress and the trial judge, satisfied that the verdict as reduced is just, overrules the request for a new trial, the appellate court on appeal must begin with the further presumption that the trial judge has wisely exercised his discretion and has seen nothing in the conduct of the jury to convince him that the verdict as a whole was the work of passion or prejudice.

These presumptions are not conclusive and it is a well-recognized principle that gives to appellate courts the right in the interest of justice to compel, as the price of an affirmance, a remission of a part of the judgment where it appears that an error has been honestly made in arriving at the amount of the recovery or to remand the cause when the court is convinced that the excess in the verdict is but one of the manifestations of passion or prejudice in the triers of fact. [Hewitt v. Steele, 118 Mo. 463; Burdict v. Railroad, 123 Mo. 221; Chitty v. Railroad, 148 Mo. 64; Smoot v. Kansas City, 194 Mo. 513, 92 S. W. 363; Chitty v. Railroad, 166 Mo. 435.]

We have said that the fact that a verdict is excessive of itself is no indication of improper conduct save

in exceptional cases. The exception with which we are concerned in the present inquiry relates to cases where the amount of the verdict is out of all reasonable proportion to that which the facts in evidence would justify. It is here that counsel for defendants contend that the principles announced in the adjudicated cases are vague and unsatisfactory. Judge GOODE thus defined the rule in Ice Co. v. Tamm, 90 Mo. App. 1. c. 202: "When the amount assessed is so glaringly unauthorized by any evidence, so outrageous and conscienceless as to compel a conviction that the jury were poisoned with prejudice and inflamed with resentment against the losing party and therefore incapable of impartially weighing the evidence on the various issues submitted to them, their verdict must be wholly set aside. They are proven by the event to have been dominated by sentiments which unfitted them to participate in the administration of justice." In such a case a remittitur is inadequate to serve the ends of justice; for vice of such a nature is all pervading and it would involve a solecism to say that a jury could act fairly and impartially in solving the issues relating to facts constitutive of the cause of action, but intemperately or vindictively in estimating the amount of recovery. In Burdict v. Railroad, 123 Mo. 221, the Supreme Court said: "The verdict may be so large and out of all reason as of itself to furnish sufficient evidence that it was the result of passion or some other improper influence." Judge ROMBAUER observed in Clark v. Ins. Co., 61 Mo. App. 181, that the excess, to constitute a ground for a reversal of the judgment, should be "unwarranted by any reasonable interpretation of the evidence." While Judge MARSHALL in Malloy v. Railway, 173 Mo. 1. c. 85, expressed the idea that when the amount awarded "shocks the judicial sense of right and justice" a remission of part of the judgment will not suffice.

It is difficult to formulate a more definite rule than

that defined in the cases mentioned. It is true that what might shock the conscience of one judge might not appear so unreasonable to another. All such terms as "shocking," "outrageous," "wholly unreasonable," or "unwarranted by any evidence," leave uninclosed a very wide range for the display of purely individual conceptions of honesty in the conduct of others and to that extent their employment in definitions does not provide an exact or uniform rule. Nor in the very nature of the subject can one be stated. Given the verdict of the jury and the evidence which they were bound to consider, the line of demarkation between the fields of right and wrong acting cannot be accurately surveyed. Every intendent must be in favor of right acting and the most any judge can do is to endeavor to place himself in the jury box and then determine whether twelve honest, reasonable men could have fallen into the error evidenced by the excess in their verdict. If he believes that they could have honestly made the mistake in a fair consideration of the evidence, then no reason can exist for disturbing the finding on the issues involved in the cause of action and a remittitur will accomplish exact justice between the parties since the fact that the jury gave the winning party more than his evidence warranted implies that they honestly accepted his evidence, rejected that of his adversary in conflict thereto and intended to give him all that his evidence entitled him to receive. On the other hand, if the judge in the situation supposed reaches the conclusion that no honest and reasonable mind could have fallen into the error disclosed under any reasonable view of the evidence, it must follow that the verdict should be regarded as the offspring of improper motives and should not be permitted to stand in any event. Such vice cannot be cured save in the granting of a new trial. [Longan v. Weltmer, 180 Mo. 322; Bolton v. Railroad, 172 Mo. 92; Sheedy v. Brick Works, 25 Mo. App. 527;

Hollenbeck v. Railroad, 141 Mo. 97; Perrette v. Kansas City, 162 Mo. 238; Unterberger v. Scharff, 51 Mo. App. 102.]

Applying these principles to the facts in hand, we find no reason for impugning the motives of the jury. Their mistake easily can be harmonized with an honest and conscientious regard for duty and even with a proper comprehension of most of the salient facts in evidence touching the value of the cattle. Evidently, the error grew out of a single misunderstanding. Witnesses for plaintiff in their testimony divided the cattle into two classes—the "tops of the herd," and those inferior in weight and quality. Of the former, which they numbered at 100, they estimated the average weight of each animal at from 1150 to 1200 pounds and their value from $4.50 to $5.00 per hundred pounds. The inferior cattle numbered at 95, they estimated to be in weight from 1000 to 1050 pounds and valued them at from $4.35 to $4.60 per hundred weight. When asked to give the value per animal, it was given at from $55 to $58 for each of the "tops" and at $45 or $46 for the others. The whole herd was averaged at $50 to $51 per head. The verdict deducting allowance for interest placed an average value on each animal of $56.39, so that it is reasonable to infer that the jury inadvertently took as a basis for their computation a value stated by the witnesses as applying to the "tops" alone and applied it to the whole herd. Considering the array of estimates and figures presented to the jury by the various witnesses, it is not at all remarkable that they should have fallen into some confusion and it is to correct just such errors as this that the right to exercise a wise discretion in supervising the verdicts of juries is lodged in trial judges. Certainly, it would be a harsh and unfair rule that would justify a court in pronouncing an error of this sort to be the result of passion or prejudice. The learned trial judge did not abuse

his discretion in denying a new trial on this ground.
[Arkansas Cattle Co. v. Mann, 130 U. S. 69.]

The final ground on which a new trial is sought is
the alleged misconduct of plaintiff towards the jury dur-
ing the progress of the trial.  On the last day of the trial,
which consumed three days, defendants filed a motion
to discharge the jury because "the plaintiff John Mc-
Graw has talked and held conversation with three or
more of the jurors empaneled to try this cause." Affidav-
its were filed in support of the motion and the plaintiff
was put on the stand and examined.  The motion was
overruled.

It appears from the affidavits that plaintiff during
the recesses of the court on several occasions sat in the
courtroom near to members of the jury and joined in
general conversation with them.  Defendants' counsel,
observing the frequency of these occurrences, concluded
that they were not purely accidental and complained to
the judge who promptly directed counsel for plaintiff
to advise their client to keep away from the jury.  The
warning was given, but at the following noon recess
plaintiff seated himself near a juror at about the time
for court to convene.  It chanced that the judge was
late in returning from luncheon and as he entered the
courtroom the juror remarked to a fellow member that
"the judge must have had fish for dinner."  Plaintiff
laughed at this insipidity as one who laughs at a mirth-
provoking jest.  The incident did not escape the watch-
ful notice of defendants' counsel and their indignation
excited by what appears to them to be a willful disregard
of the admonition of the court was not lessened when
they learned the cause of plaintiff's ebullient display
and realized the subtle and insidious nature of the flat-
tery contained in such a pleasing demonstration over the
repetition of a stale joke.  Plaintiff was an old man, a
Kentuckian, a stranger in Kansas City and by nature
as well as habit inclined to sociability.  He testified that

he did not know the jurors by sight when they were out of the jury box and did not know to whom he was talking. It is not even intimated that he talked about his case in any of these conversations.

In Kennedy v. Holladay, 105 Mo. 24, the Supreme Court approved the statement of the rule applicable made in Vaughn v. Dotson, 2 Swan 348. "If a party do an improper act with the design to bias and influence any of the jurors, their verdict in his favor will be set aside as a punishment to him and no inquiry will be made whether the improper act prejudiced and tainted the verdict or not. The mere attempt to tamper with jurors and to corrupt them shall have the effect to vitiate a verdict rendered in his favor. The rule is founded in public policy the better to preserve the purity of trial by jury. But if the act done was a mere accident, or inadvertence without any improper design, and if it can be safely assumed that it had no improper influence upon the minds of the jurors in such case, there can be no just or reasonable ground to disturb the verdict." It is the duty of litigants and their attorneys to refrain while the trial is in progress from seeking the companionship of jurors during the necessary adjournments and recesses. They should avoid even the appearance of evil and when it is brought to the attention of the trial judge that any person interested in the result of the cause on trial is attempting to court favor with jurors by any sort of attention a prompt and sufficient rebuke should be administered and should it appear that a party or his counsel with improper design has succeeded in bestowing favor on a juror, though it consists of nothing more than social attention, a verdict in favor of the offending party should be set aside. But accidental encounters between parties and jurors are matters of common occurrence and are quite unavoidable. A party is not required to be able to recognize each juror wherever

he may see him nor when he does recognize one, to go out of his way to avoid meeting him.

We do not think the showing made by defendants discloses any improper design on the part of plaintiff. His conduct, the subject of criticism, occurred in the court room while it was occupied by the usual concourse of court officers, jurors, parties, attorneys and witnesses. He seated himself in a place provided for such as he and to condemn him because he indulged in harmless conversation with his neighbors, among whom were jurors, would be to give rein to insubstantial, and we believe, unjust suspicion. Judged by what we gather of his characteristics from the record, plaintiff was not of a discriminating disposition, but would talk to anybody at any time without knowing or caring who his companions were. The question of granting a new trial on the ground under consideration rests largely in the discretion of the trial judge who enjoys the advantage of having the parties before him and "its action in denying the new trial will not be disturbed in the absence of evidence showing it was clearly wrong." [Kennedy v. Holladay, supra.] We find no evidence to justify us in interfering with the result of the discretion exercised and the point must be ruled against the contention of defendants. [Hamburger v. Rinkel, 164 Mo. 398; Bank v. Fults, 115 Mo. App. 42; Reed v. City of Mexico, 101 Mo. App. 155.]

The judgment is affirmed. All concur.