**SUNSET ACRES MOTEL, INC., a Dissolved Corporation, Respondent,**

v.

**Sydney JACOBS and Sylvia Jacobs, Co-Partners d/b/a Sydney Jacobs Realtors, and William Goodman, Appellants.**

No. 47190.

Supreme Court of Missouri,

Division No. 2.

June 13, 1960.

Appellants' Motion for Rehearing or for Transfer to Court En Banc Denied July 11, 1960.

Elmer Price, Milton I. Goldstein, St. Louis, for appellants.

Greensfelder, Hemker & Wiese, Forrest M. Hemker, Mark R. Gale, St. Louis, for respondent.

EAGER, Judge.

This is a suit by a dissolved corporation (see § 351.565 RSMo 1949, V.A.M.S.) against the members of a real estate brokerage partnership and its employee for damages on account of fraudulent representations, concealment and breach of trust in connection with the sale of a motel. Plaintiff recovered $15,000 as actual damages; the jury allowed no punitive damages. Following the overruling of their motion for new trial, defendants appealed. We shall refer to the parties as plaintiff and defendants; and, since Frank Lama was the principal stockholder and chief representative of the plaintiff, we may at times refer to him as the plaintiff.

Mr. Lama had built this motel and operated it for three or four years; desiring to sell it, he employed the defendants Jacobs as his agents and gave them a ninety-day exclusive listing under date of June 23, 1955. The sale price was fixed at $300,000 with a 5% commission. This listing expired in September 1955 with no sale made, but Lama stated thereafter, in substance, that defendants might continue their efforts to make a sale. The salesman principally involved in this deal was William Goodman, one of the defendants. Except where a distinction is necessary, we shall occasionally refer to the defendants collectively as "Jacobs." In October 1955 Lama was advised by Jacobs that the Koch family was interested in purchasing the motel. This family consisted of Alphonse J. and Evelyn Koch, their son Vernon A.

Koch and his wife June M. We shall merely refer to these persons as the Kochs, since they acted jointly in so far as we are concerned. The Kochs examined the motel and were definitely interested, but they were short on the financing. They owned a commercial property at Thrush and Lillian in St. Louis, consisting of a grocery store and two small shops, with living quarters above (which we shall refer to as the Thrush property) and a residence on Fontaine Avenue; they had $10,000 in cash. The equity in the Fontaine property was recognized to be $10,000. The value of the Thrush property was questionable. Goodman prepared a sales contract dated November 9, 1955, proposing to sell the motel to the Kochs for $300,000 by raising $150,000 on a first deed of trust, having plaintiff take back a second deed of trust for $80,000, deeding the Fontaine property to the seller at $10,000 and the Thrush property at $50,000, with the balance of $10,000 to be paid with the cash available. The Kochs signed that contract and made a $2,500 deposit with Goodman. At substantially the same time Goodman prepared a proposed form of contract (dependent on the closing of the principal sale) whereby Jacobs proposed to buy the Thrush property from plaintiff at an unstated amount. This was not signed by anyone. He also prepared a contract between the Kochs and Jacobs under date of November 10, 1955, which, upon the assumption that plaintiff would take the Thrush property at $50,000, provided that Jacobs agreed to repurchase it from plaintiff at an unspecified price, the Kochs agreed that if Jacobs resold the property for less than $40,000 net, they would pay him the difference between the proceeds of the sale and $40,000 (but not to exceed $15,000) in the form of a note secured by a third deed of trust on the motel property. The proposed note and deed of trust were particularly described. This agreement was executed by the Kochs only, but it remained in the possession of Jacobs. Goodman presented the $300,000 sales contract to Lama, along with the pro-

posed agreement to repurchase Thrush at an unspecified sum; apparently Goodman then suggested a repurchase at $22,500. He admittedly did not show Lama at any time the agreement signed by the Kochs, as last described. Lama had examined the Thrush property and said that he did not want it at any price and he told Goodman, in substance, to "work it out" himself, or to sell it themselves. The $300,000 contract was never given serious consideration by Lama because he did not want the Thrush property. Numerous conferences and negotiations followed. According to Mrs. Evelyn Koch, Goodman next suggested to them a purchase of the motel at $290,000 with the Thrush property valued at $40,000; then a purchase at $287,500 with Thrush valued at $37,500. In these negotiations Goodman eventually stated that since Lama did not want their Thrush property, Jacobs would guarantee them $22,500 for it and (according to Mrs. Koch) "We would owe them fifteen thousand dollars," with a credit for any overplus on resale. Goodman never discussed with the Kochs a purchase of the motel at $280,-000, and when they first saw the $280,000 contract, that figure was lined out and $272,500 was substituted.

Goodman told Lama that $280,000 was the most that the Kochs would be interested in paying, and Lama then said that if he "came down" to that price he would certainly pay no more than $5,000 as a commission. In a further conference Goodman got Lama to agree to a commission of $7,500 on the $280,000 figure. A sales contract was prepared at $280,000, dated November 16, 1955; this contract was originally drawn by Lama's attorney. It provided that the seller agreed to pay $7,500 "as full commission upon the closing of this sale." Goodman then prepared a new form of contract (the one which was eventually signed) at $280,000, merely eliminating this quoted wording and leaving the matter of commission blank. About this time either Jacobs or Goodman called Lama and asked him if it would be satisfactory to show the sale price as $272,500 net; Lama called his attorney and then agreed, provided the wording "no commission of any sort is due or payable by seller" was inserted in the contract. When Lama signed it these words were inserted. Prior to the meeting at which the contract was signed the typed sale price of "$280,000" had been changed in ink to $272,500; in that form it had previously been presented to the Kochs and the change initialed by them. Though dated November 16, 1955, the contract was signed on or about November 21st.

Under date of November 19, 1955, Jacobs had taken from the Kochs an agreement (somewhat similar to the one dated November 10th, and contingent upon the closing of the main deal) whereby: he agreed to buy the Thrush property from them at $22,500, and resell the same; if the resale was at less than $37,500 net, the $22,500 guaranteed price would be reduced accordingly; and the Kochs were to give Jacobs a note and third deed of trust on the motel property for $15,000 at 6% interest payable in monthly installments, to assure him a compensation of $15,000. Jacobs admitted that this agreement was procured at substantially the time when they were talking to Lama about the $272,-500 net deal, but Goodman testified that it was actually executed after the sales contract, although prepared earlier. In connection with the negotiations of Goodman for the $15,000 note, Mrs. Evelyn Koch testified:

"Q. (By Mr. Hemker) Well, now, tell us what was said about that. You said that he told you first that it was two-hundred-and-eighty-seven-thousand-five-hundred, the price, didn't he? A. Yes.

"Q. Now, how did he explain to you that two-hundred-seventy-two-thousand dollar figure that is in the contract that you signed? A. Well, Mr. Goodman said two-hundred-and-seventy-two-thousand, plus the fifteen

thousand for commission, as he called it, would make two-hundred-eighty-seven-thousand-five-hundred dollars, which was the amount we paid—two-hundred - eighty - seven - thousand - five-hundred dollars.

"Q. Did you have any other conversation with him about why he was having you pay the commission instead of Mr. Lama? A. Well, he said when the buyer pays the commission, whether—it's just added on. If the seller wants a certain price, a commission is added on and that's what the buyer has to pay.

"Q. Yes. Go ahead. A. So what was the difference, if he paid—if we gave him the money and he paid, Mr. Lama, or if we owed Mr. Jacobs the money, which we thought was all right, too. It was two-seventy-two plus fifteen thousand dollars commission, made two-hundred-and-eighty-seven, which was the whole—which was the price we paid."

Goodman testified that he told the Kochs that Lama was selling for $272,500 net, that "we had no commission," and that they would have to pay it.

It is conceded that Lama was never told of the contract between Jacobs and the Kochs, nor did he know of the $15,000 note and deed of trust; he learned of them some months after the closing. He did not inquire of the Kochs as to whether they were paying any commission, nor did Lama and the Kochs ever discuss the purchase price directly. Just prior to the closing, and on the same day, Jacobs had the Kochs execute the $15,000 note and deed of trust. He eventually sold the Thrush property at a figure which netted $4,627.49 in excess of the $22,500 guaranteed figure and gave them credit by cancelling the $15,000 note and deed of trust and taking new ones for the adjusted figure. These called for payments of $195.95 monthly, all of which (23 in number) had been made to the time of

trial. Jacobs had arranged temporary financing on the Thrush property pending the closing of the motel sale, so that $22,500 from that source was used in the closing. It is apparent that the Kochs were easily persuaded because they were unable otherwise to raise the cash necessary for the purchase of the motel, even at the $280,000 figure used in dealing with Lama.

The sale was consummated on January 3, 1956 at the Title Company; the closing statement showed the purchase price at $272,500, with a notation "no commission from seller." The first mortgage financing was reduced from $150,000 to $145,000, and Lama increased the second from $80,000 to $85,000. He also took a chattel mortgage as additional security. By the proceeds of this financing, plus the Fontaine property at $10,000, $10,000 in cash from the Kochs, and the $22,500 raised on the Thrush property, the $272,500 net figure to Lama was thus arrived at.

Since the valuation of the $15,000 note given by the Kochs was an issue on the matter of damages, defendants produced a Mr. Seeman, President of a mortgage banking firm, as an expert witness. In answer to a hypothetical question, he stated that as of January 3, 1956, the value of the note and third deed of trust would be $6,750 to $7,200, plus "a calculated value of the contract" for the sale of the Thrush property. He was unable to give a value to that contract as of January 3, 1955; he had not considered the fact that the four Kochs had signed the note or their responsibility, nor the making of the subsequent payments, nor the income derived from the motel. He gave it as his opinion that the adjusted note for $10,372.51 was worth from $5,500 to $6,000 as of April 1, 1956. These figures were apparently based on assumed discounts to be applied to a third mortgage note.

We do not deem it necessary to digest the pleadings, for no point is made of any deficiency. The following facts become necessary because of the point made that a

mistrial should have been declared. Prior to the convening of court on the third morning (April 17, 1958) a woman juror was observed talking to Mrs. Lama in the hall. This was reported to the court by defendants' counsel. Upon interrogation of both the juror and Mrs. Lama by the court it was developed that the juror came over and struck up a casual conversation about the weather and the juror's little boy, and that the juror showed Mrs. Lama pictures of the boy. Nothing was discussed remotely bearing on the case. It was also reported to the court by defendants' counsel that on the same morning Mr. and Mrs. Lama were seen talking to juror Wise, while standing at an open window in the courtroom. All three were examined by the court about this. All testified, in substance, that Mr. Wise had stopped at the window, remarked on the weather, said he'd like to go fishing and that he had gone somewhere the evening before to look after some concrete job he was handling; also, that he had a cabin or some place where he usually went on weekends. The Lamas simply agreed about the weather and fishing. There was no discussion of the case whatever. Mr. Wise was further questioned by the court concerning any possible prejudice, cautioned that he must keep an open mind on the case and told not to discuss what had occurred with the other jurors. The extent of this examination may have impressed him. The court had regularly cautioned the jury at each adjournment about discussing the case. A motion for a mistrial based on these occurrences was overruled.

Shortly after the foregoing occurrences and while the court was in recess, Jacobs and Goodman went to the coffee counter in the court building. There they saw Mr. Wise and three or four other jurymen. They testified (differing slightly) that Wise called out to them: "Hey, can I talk to you about fishing? You wouldn't want to go fishing?" Jacobs stated that the remarks seemed to him to be sneering and hostile. Jacobs and Goodman said nothing and walked away. This occurrence was promptly reported to the court. Jacobs, Goodman, Wise and four other jurymen were interrogated by the court concerning this incident. Mr. Wise testified that he had merely stated again in answer to some question, that he would like to go fishing as soon as he could get away, and that he did not make the controverted statements to Jacobs and Goodman, but had only passed the time of day with them. The court again cautioned him and asked him if he could give both parties a fair trial and he stated that he intended to do so. When asked again if anything had occurred to "influence" him, he answered "No," that this was his first time on the jury and that he was trying to do what was right; at that point he added: "Well, I don't know if they're trying to push me, but they ain't going to get nowhere. I'll try to do what's right, what I think is right, and that's as far as it's going to go with me." The versions of the affair as related by the other jurors varied somewhat. One said that Wise directed the "fishing" remark to the defendants in a friendly manner; another stated that he said it loudly, but in a friendly manner; another heard no conversation between these people; and the last one heard a "fishing" remark but did not know to whom it was made. In all this questioning of the jurors, counsel were given an opportunity to participate. These jurors were carefully cautioned by the court and all stated that they could give both parties a fair trial. After extensive arguments this second motion for a mistrial was overruled.

■ We first consider the point that the court abused its discretion in overruling each and both of the motions for mistrial. It is not claimed that the case was even remotely discussed in these encounters with jurymen, nor that plaintiffs or their counsel were responsible for the occurrences. Defendants say, in effect: that these occurrences caused tension and confusion, and raised "subtle doubts" in the minds of the jurors; that it became clear that the defendants were the ones who had com-

plained; that prejudice and mistrust against the defendants resulted, and that the statements of nonprejudice by the jurors themselves are not a complete refutation; that it was evident that juror Wise was deeply affected and that the court also was deeply concerned over the last incident. Defendants rely here, principally, on Benjamin v. Metropolitan Street Ry. Co., 245 Mo. 598, 151 S.W. 91, 96, and Fitzpatrick v. St. Louis-San Francisco Ry. Co., Mo., 327 S.W.2d 801, though other cases are cited. It is true that the courts must seek to avoid not only those influences that "actually work evil," but also those that "have the appearance of evil." (Benjamin, Fitzpatrick.) It is also true that each party is entitled to a fair and impartial jury, in so far as the court may provide it. In Lee v. Baltimore Hotel Co., 345 Mo. 458, 136 S.W.2d 695, 127 A.L.R. 711, cited by defendants, one man had served by falsely impersonating another who was summoned for jury service. In Benjamin, supra, defendants' agents had associated with jurors, though presumably innocently, after the court had observed one such incident and had given specific instructions that no such further association be had. The trial court granted a new trial. The Fitzpatrick case involved a wholly different situation, with the court reaffirming the governing principles. And the court indicated there that if evidence of prejudice or nonprejudice was needed or desired, it could have been obtained by interrogation of the jury at the time. That was done here, fully. In Ullom v. Griffith, Mo.App., 263 S.W. 876, also cited, a juror had criticized counsel's examination of a witness who cried on the stand. These cases are not controlling here. It is true that the assertions of jurors as to their attitudes or prejudice are not conclusive on the court (Ullom, supra), and that the appellate courts are more liberal in sustaining an order granting a new trial than one refusing a new trial (Fitzpatrick, supra; Reich v. Thompson, 346 Mo. 577, 142 S.W.2d 486, 129 A.L.R. 795). But in the final analysis, every case rests upon its own particular facts and a large discretion is right-ly vested in the trial judge who sits as an intimate observer of the whole chain of events. We may not loosely reverse his decision, though we may give the refusal of a new trial a harder look than the granting of one. In any event, we must find an abuse of discretion. We find none here. The principles generally controlling in such matters are also discussed in Kennedy v. Holladay, 105 Mo. 24, 16 S.W. 688; Boyle v. Bunting Hardware Co., Mo.App., 238 S.W. 155; Gardner v. Turk, 343 Mo. 899, 123 S.W.2d 158, and McGraw v. O'Neil, 123 Mo.App. 691, 101 S.W. 132. Parties and jurors should avoid all appearance of evil, and if any contact motivated by improper design appears, the jury should ordinarily be discharged or a new trial granted, regardless of the existence of actual prejudice. Accidental and casual contacts with jurors are of rather common occurrence and often unavoidable. If the contact has been wholly innocent, a mistrial should not ordinarily be granted unless it can reasonably be found that there was some improper influence upon the jury. Kennedy, supra. Where a juror, by some inquiry or voluntary statement has raised a question as to his impartiality, the question becomes essentially one of fact, and primarily this decision rests with the trial court. An instance somewhat similar to this (with respect to Mr. Wise's statements) is found in Kirkpatrick v. American Creosoting Co., 225 Mo.App. 774, 37 S.W.2d 996, where a juror's questions concerning a written statement of plaintiff taken by the defendant were claimed to show his prejudice; the discretion of the trial court in refusing to discharge the jury was upheld. In Riley v. St. Louis Public Service Co., Mo.App., 245 S.W.2d 666, a juror had talked with an expert witness about some phases of the case while leaving the courtroom. The court said, in part, loc. cit. 674: "The occurrence seems more than anything else to have been merely due to Shatrick's lack of appreciation of the restraint that was to be imposed upon him as a juror, and not to have been attributable to any improper motive on his part. * * * The

court obviously did not feel that the incident had in anywise affected the result; and in refusing to grant a new trial upon such ground there is nothing to indicate that the court's discretion was abused."

These incidents were unfortunate. Perhaps they were exaggerated by the scope of the investigation made and the initial questioning of Mr. Wise, but counsel apparently acquiesced in all this and desired it. The first two casual conversations of the Lamas were fully explained. The alleged statements of Wise to defendants and his attitude on the stand were painstakingly considered by the trial judge and matters of credibility were involved. The statements about fishing did not violate the instructions of the court to Wise that he should not discuss what had occurred in his interrogation. We may reasonably conclude that the trial court felt that Mr. Wise's remarks, on and off the stand, were due to an overly expansive personality. Obviously, the trial judge found that none of these matters had prejudiced the jury and we certainly may not rule, removed as we are from the scene, that he abused his discretion in so ruling. A finding here that prejudice affecting the verdict had ensued would rest largely in "conjecture and suspicion." Jacobs v. Danciger, 344 Mo. 1042, 130 S.W.2d 588, 595, certiorari denied Danciger v. Jacobs, 308 U.S. 607, 60 S.Ct. 144, 84 L.Ed. 507. We must deny this contention of error.

Defendants complain of sundry alleged defects in plaintiff's given Instruction No. 2. They have violated our Rule 83.05, V.A. M.R., by failing to set out this instruction and others complained of in the argument of their brief. Reluctantly, we shall consider the principal points made, but will feel at liberty to disregard some contentions which appear rather trivial. The brief contains sundry points and subpoints attacking Instruction No. 2. Cases are cited to the effect that a verdict-directing instruction must include all the essential elements of plaintiff's case. That may be conceded,

and the cases need not be discussed. The instruction is lengthy, but we cannot discuss it intelligently without setting it out. It was as follows: "The Court instructs the jury that if you find and believe from the evidence that the plaintiff, Sunset Acres Motel, Inc., employed the defendants to act as plaintiff's agent to procure a purchaser for and negotiate the sale of plaintiff's property mentioned in the evidence as Sunset Acres Motel, and if you find that the defendants accepted and undertook such employment, then during the course of the employment defendants owed plaintiff the duty to keep plaintiff fully informed of all facts material to the transaction; to practice good faith and exercise the highest fidelity toward and promote the best interests of plaintiff and if you find that in the course of such employment the defendants came into contact with the persons, referred to in the evidence as the Koch family, who purchased said property, and if you find that in the course of their said employment the defendants learned that the Koch family was willing to pay the sum of $287,500.00 to purchase Sunset Acres Motel and that the defendants failed to disclose such fact to plaintiff and, instead, falsely represented to plaintiff that the most the Koch family would pay for Sunset Acres Motel was $280,000, and if you find that plaintiff relied on such representation of defendants, and if you find that relying on said representation plaintiff agreed to sell Sunset Acres Motel to the Koch family for $280,000.00 provided defendants would accept the sum of $7,500.00 for their commission and that defendants agreed with plaintiff so to do, and if you find that thereafter, in reliance on said representation and agreement, plaintiff agreed to and did sell Sunset Acres Motel to the Koch family for the net sum of $272,500.00 believing that the price being paid by the Kochs was $280,000.00 as represented by defendants and that the defendants were to receive the difference of $7,500.00 in full for their commission as agreed to by defendants and if you find that the plaintiff

was induced to enter into the contract of sale by the said false representation as to price and the said agreement respecting the commission of $7,500.00 as set out above, and if you find that the Koch family in addition to the $272,500.00 paid to plaintiff for the purchase of Sunset Acres Motel also paid defendants the additional sum of $15,000.00 in the form of a note secured by a third deed of trust on the Sunset Acres Motel and that the Koch family actually paid a total of $287,500.00 for Sunset Acres Motel, if you so find, and if you further find that the defendants concealed from and failed to disclose to plaintiff that defendants were receiving and did in fact receive said note and third deed of trust for $15,000.00 from the Koch family and that the Koch family was paying and did actually pay $287,500.00 for Sunset Acres Motel, and if you find that these were substantial and material facts concerning the transaction which defendants should have realized would likely affect the judgment of plaintiff and plaintiff's decision to sell Sunset Acres Motel upon the terms mentioned in evidence, then, if you so find all of the facts in this instruction set out, then you are instructed that you may find that such facts and conduct on the part of defendants constituted a violation of the duty defendants as agents owed to plaintiff as their principal, and if you do so find, and if you further find that plaintiff was damaged thereby, then your verdict shall be for the plaintiff and against the defendants."

■ Defendants attack the submitted hypothesis that the Kochs were "willing to pay the sum of $287,500," and that they did pay such total sum. This criticism seems to be based on the fact that the Kochs had only $250,000 available in total financing, aside from the Thrush property; that it was only by virtue of Jacobs' purchase of Thrush at $22,500, that a price of even $272,500 was raised; and, therefore, that there could have been no "bona fide" willingness or offer to pay $287,500. The fact remains that Goodman represented the total price to the Kochs as $287,500 and that

they clearly understood that such was what they were paying. We have quoted Mrs. Koch's testimony. And, moreover, they *did pay* that figure at the closing, even though the $15,000 note and third deed of trust went to Jacobs and Goodman. The argument that the Kochs did not have $287,-500 or $280,000 would be just as applicable to the $272,500 figure, for all were based on Jacobs' acceptance of the Thrush property at $22,500; the only difference was that the Kochs were required in the final deal to add an additional note and deed of trust for Jacobs, over and above the $272,500 figure. This deed of trust was an encumbrance on the motel property and this part of the payment constituted, so far as the Kochs were concerned, a payment just as bona fide as was the first mortgage note. Jacobs accepted the note and deed of trust as a bona fide payment, and at the time of trial he and Goodman had collected approximately $8,600 on it. The "risk" he supposedly took on his compensation is immaterial. There was sufficient evidence for this submission. Next, defendants complain that the instruction permitted the jury to find that $280,000 was the highest offer submitted to plaintiff by defendants, and that this was not true because an offer of $300,000 had initially been made. Everyone connected with the case understood that the $300,000 contract did not even receive serious consideration, because therein plaintiff was required to take the Thrush property at $50,000. It had passed out of the picture, as both plaintiff and defendants understood. The failure to refer to that contract could not have misled the jury, nor was its hypothesization essential. The real controversy concerned only the subsequent developments. It was an essential fact that defendants had represented to plaintiff that $280,000 was the most the Kochs would pay. There was ample evidence to sustain this submission, not only by Lama's testimony, but by admissions of the defendants.

■ What we have said largely disposes of the argument that the instruction

failed to distinguish between the offer that required plaintiff to take the Thrush property in trade and those which did not. That is immaterial, for the only offer proposing a trade passed out of the picture almost as soon as it was made. Jacobs then saw fit to substitute money which he raised (largely on a loan) in place of the Thrush property. The instruction put no "duty" upon him to buy; he assumed that himself. We fail to see how the instruction ignores the contract of sale; it merely asserts a misrepresentation based on that contract as a foundation for plaintiff's knowledge.

It is also claimed that the instruction "improperly assumed a limitation of $7,500.- 00 on defendants' commission." We do not so construe it. It does permit the jury to find that plaintiff agreed to sell for $280,000, "provided defendants would accept the sum of $7,500 for their commission and that defendants agreed with plaintiff so to do * * *"; also, to find that plaintiff believed that defendants were to receive the $7,500 in full for their commission. There was evidence to support this submission in the conversations between Lama and Goodman. If the jury chose to find that there was no such agreement or that plaintiff did not rely thereon, either because of the wording "no commission * * * payable by seller" in the $272,500 contract or otherwise, it was at liberty to do so. The jury could have found, as defendants really argue here, that no limitation on the total commission was imposed, but it did not choose to do so. We find further that there was no assumption in the instruction that the $15,000 note was worth its face value. Defendants say that the only evidence was that it was worth less. The "$15,000" figure in the instruction was used primarily by way of description of the note, but in any event the jury was required to find the amount which the Kochs actually paid. On such an argument it might equally be questioned whether the $85,000 second mortgage note received by plaintiff was worth $85,000 and whether

this element was also assumed in the instruction. The instruction submitted fairly the essential elements of plaintiff's case and we do not find it erroneous.

■ Defendants also claim error in the giving of Instruction No. 3. Briefly, it advised the jury: that if its verdict was for plaintiff under Instruction No. 2, then defendants had forfeited all right to compensation and could retain nothing; and that it might assess actual damages at such sum as it might find to be the value of the $15,000 note when received by defendants. The argument of defendants is that, even on plaintiff's theory, the defendants got a $7,500 commission from plaintiff which he knew about (by reducing plaintiff's price from $280,000 to $272,500 net) and an additional $7,500 from the Kochs; that the hidden $7,500 might be held to belong to plaintiff and thus be regarded as actual damages, but not the entire value of the $15,000 note. They argue, therefore, that the forfeiture of the original, known $7,500 commission was a *penalty,* that plaintiff could not have actually been damaged by what he had knowingly paid, and that the instruction was thus erroneous in submitting the whole value of the $15,000 note as actual damages. Stated another way, defendants say that in such a case the actual damages may only be the secret or hidden compensation received, and that these could not exceed $7,500 here; this, because this hidden commission would, on plaintiff's theory, belong to it, whereas the $7,500 concededly paid to defendants could not belong to plaintiff. Thus, defendants say the jury was permitted to award actual damages in a sum which was excessive by $7,500, and which was, in effect, a combination of actual damages and a penalty.

Certainly all damages here must be classified as either actual or punitive. Defendants cite Utlaut v. Glick Real Estate Co., Mo., 246 S.W.2d 760. There an agent had himself been interested in a purchase, and he not only collected a commission but realized a profit on resale. The court held that

plaintiff made a submissible case on defendant's fraud in violating its fiduciary relation with plaintiff by conducting secret dealings through a straw party, by taking a position antagonistic to its principal, and by failing to disclose the true facts. The court also held that Instruction "A" offered by defendant on actual damages was properly refused because it excluded therefrom the known commission paid. The court said, loc. cit. 764: "If defendant was unfaithful to its trust as such agent and secretly made a profit for itself, as all the authorities show, it was not entitled to keep either the profit or the commission and what it did with the money was no defense to plaintiff's claim for its recovery. See Van Raalte v. Epstein, supra, 202 Mo. loc. cit. 196, 99 S.W. 1077. Plaintiff was entitled to have the jury so instructed." We must conclude that the court was there considering actual damages only, for the instruction referred only to actual damages, and evidence affecting punitive damages was discussed later. The case certainly does not indicate that the commission knowingly paid should be excluded from the actual damages. It rather indicates the contrary. Defendants also cite State ex rel. St. Joseph Belt Ry. Co. v. Shain, 341 Mo. 733, 108 S.W.2d 351, and Hussey v. Ellerman, Mo. App., 215 S.W.2d 38, as holding that actual damages are measured by the loss sustained by the plaintiff. Those cases have no analogy on their facts. They merely state the principle and differentiate between actual and punitive damages. Here the trial court was correct in saying that if defendants were found to have been unfaithful they forfeited all right to compensation. Utlaut, supra, and cases there cited; 8 Am.Jur. Brokers, § 142, p. 1067; 12 C.J.S. Brokers § 69, p. 158; King v. Pruitt, 365 Mo. 823, 288 S.W.2d 923. The loss of the commission paid by plaintiff is not a true penalty such as is comprehended within the scope of punitive damages. These are "inflicted by way of punishment for the doing of an act maliciously * * *" (State ex rel. St. Joseph Belt Ry.

Co. v. Shain, supra [341 Mo. 733, 108 S.W.2d 356]). Commissions paid to unfaithful agents have been held recoverable without even a discussion of punitive damages. Van Raalte v. Epstein, 202 Mo. 173, 99 S.W. 1077; Northcutt v. Fine, Mo., 44 S.W.2d 125. The theory is, perhaps, that the commission was never rightfully paid under the circumstances, that the money still belongs to the seller, and that he has been damaged to the extent of the wrongful payment. The recovery of punitive damages is always optional with the jury, whereas the law is that the unfaithful agent must make restitution of all that he has received by his perfidy, including commissions (Utlaut, supra; Northcutt, supra; Van Raalte, supra). The so-called "forfeiture" here was simply a liquidated part of the actual damages. We find no error in Instruction No. 3.

Instruction No. 5 submitted the issue of punitive damages. Defendants say that it confounded the errors of Instructions No. 2 and No. 3 and that is misled and confused the jury. It permissibly hypothesized again the essential elements of plaintiff's case, along with those elements which would support an award of punitive damages. We have held that Instructions 2 and 3 were not erroneous. It was not error to hypothesize the same essential elements along with a submitted hypothesis that they demonstrated an intent to "cheat and defraud," done wilfully and maliciously. In no other way could the matter of punitive damages be submitted. Moreover, the jury awarded no punitive damages. It has been held that claimed error in a punitive damage instruction will not be considered where the jury awarded no punitive damages. Rodgers v. Schroeder, 220 Mo.App. 575, 287 S.W. 861, 864; Kretzer Realty Co. v. Thomas Cusack Co., 196 Mo.App. 596, 190 S.W. 1011, 1014; Brown v. Payne, Mo., 264 S.W.2d 341, 345. We prefer, however, to rule this point on the grounds first stated.

It is also urged that the verdict for actual damages is excessive; that only one expert testified as to the value of the $15,000 note, and that he valued it as $6,750–$7,200, plus a "calculated" value of the agreement to apply any overplus resulting from the sale of the Thrush property; that this total, in any event, would not have exceeded $11,827.49, whereas the jury awarded plaintiff $15,000; and that the amount of the verdict indicated bias and prejudice. Plaintiff was in nowise bound by this expert testimony even though it was uncontradicted. The weight of such testimony is for the jury. Kimpton v. Spellman, 351 Mo. 674, 173 S.W.2d 886, 892; In re Proceedings to Open Sixth Street, 276 Mo. 158, 207 S.W. 503, 504; Proceedings for Condemnation of Private Property for Sixth St. Expressway v. National Engineering & Mfg. Co., Mo.App., 274 S.W.2d 490, 492. The jury awarded no punitive damages, and we see nothing in this verdict which demonstrates bias and prejudice. The cases cited by defendants merely reaffirm the right of the trial court to set aside a verdict where it is so excessive as to indicate bias and prejudice. Sofian v. Douglas, 324 Mo. 258, 23 S.W.2d 126; Bailey v. Interstate Airmotive Inc., 358 Mo. 1121, 219 S.W.2d 333, 8 A.L.R.2d 710; Dye v. St. Louis-San Francisco Ry. Co., Mo., 234 S.W.2d 532. We do not find here that the size of this verdict, coupled with any circumstances of the trial, indicated bias and prejudice. The jury simply found the note to be worth its face value. It has been held that in the absence of other evidence the value of notes or other securities is their face value. Bowman v. Branson, 111 Mo. 343, 19 S.W. 634, 639; Moffit v. Hereford, 132 Mo. 513, 514, 34 S.W. 252, 254; Muck v. Hayden, 173 Mo.App. 27, 155 S.W. 889, 891; Henry v. North American Ry. Construction Co., 8 Cir., 158 F. 79. This rule undoubtedly has its limitations, but since the jury here could disregard the oral testimony of defendants' expert, then we think it might reasonably have found actual damages up to the face amount of the note. The expert testimony was rather vague in any event, since the witness had disregarded one or more elements material to such a valuation. Defendants simply failed here to convince the jury that the $15,000 note and deed of trust were worth less than their face value. We cannot hold the verdict to be excessive for that reason. The trial court, with a greater latitude than we have, did not so find.

The last point made is that the case should have been tried in equity. The theory of this argument is that it was necessary for plaintiff first to seek reformation of the sales contract by substituting a $280,000 sales price for the $272,500, and by imposing a limitation of $7,500 on the total amount of commission to be received. Defendants say that here the jury was permitted to reform the contract and then find defendants guilty of fraud. Certainly a reformation, when and if necessary, may be granted only in equity. We need not discuss defendants' cases to this effect. The contract here was between plaintiff and the Kochs; neither of those original parties is seeking any recovery from the other. The complaint is by plaintiff-seller against its own agents, who were not parties to the contract, but only indirect beneficiaries by way of commissions. Plaintiff has sued in tort for the breach of a relationship arising through contract. The written contract was merely evidence of the breach, along with sundry oral testimony; it was not the basis of plaintiff's action. Under these circumstances reformation was unnecessary. See, generally, Van Raalte v. Epstein, 202 Mo. 173, 99 S.W. 1077, 1082, for the jurisdiction of the law courts in actions against brokers for fraud. It also seems significant that in this law action defendants have raised no point as to the sufficiency of the evidence. If a tort was committed and the evidence was sufficient to establish it, the possible exist-

ence of some other form of action would seem irrelevant.

We find no prejudicial error and the judgment is affirmed.

LEEDY, P. J., STORCKMAN, J., and BROADDUS, Special Judge, concur.